The INDIANA NATIONAL BANK,
Appellant (Defendant Below),

v.

William Earl CHAPMAN, Appellee
(Plaintiff Below).

No. 4–683A191.

Court of Appeals of Indiana,
Fourth District.

Sept. 4, 1985.
Rehearing Denied Oct. 22, 1985.

Robert J. Wicker, Van Valer, Wicker & Williams, Greenwood, for appellant.

William W. Knowles, Raymond L. Faust, Baker Orbison Bales & Knowles, Carmel, Thomas G. Brenton, Brenton & Brenton, Danville, for appellee.

MILLER, Presiding Judge.

The Indiana National Bank is before us appealing the trial court's denial of its motion for a directed verdict which resulted in a jury verdict in favor of William Earl Chapman. The complained of deed oc-

curred when a loan officer with the Bank released information pertaining to Chapman's automobile loan account to a state policeman who was conducting an arson investigation involving Chapman's car. Chapman was subsequently charged with fourth degree arson; however, the charges were later dismissed. Chapman then filed this action alleging four alternative theories of recovery: (1) invasion of privacy, (2) slander, (3) breach of implied contract, and (4) negligence. The jury found in Chapman's favor on all theories, awarding him $39,750.00 actual damages and $50,000 punitive damages. After carefully examining the evidence and reviewing the law with respect to a bank's liability for releasing information to police conducting an investigation, we find the trial court erred in not granting the bank's motion for directed verdict and reverse.

## FACTS

The facts most favorable to the judgment are as follows:

On October 16, 1974, William Chapman entered into an installment loan note and security agreement with the Indiana National Bank which provided for a 1973 Mercury as security for the loan. This agreement provided for payments of $199.67 per month commencing on November 15, 1974 and on the 15th day of each month thereafter for 35 months.

Chapman testified that very early in the loan period a payment was lost "by the bank or somebody." Thus, he made what he though was a current payment. The Bank claimed he was a month behind. Chapman and the Bank representative, Greg Austin, argued quite a bit about the loan. Chapman stated that Austin would call him every month to tell him he was over a month late in making his payment, but that Austin did not want to see his payment book which was stamped for each payment received. Finally, Chapman told Austin that, if he wanted to come and get the car, it was fine, and Chapman would see him in court.

On August 6, 1977, Chapman wanted to sell the car, so he placed a "for sale" sign in the window of the car and left it on the parking lot of a shopping center near his home. The next day, Sunday, Chapman discovered the car was gone. He called the Marion County Sheriff's Department to report the theft. On Monday Chapman called his insurance carrier to report the loss.

Chapman then left town for a week and upon his return was contacted by Sergeant Kenneth York of the State Police, who advised him the car had been recovered and took his statement. York had become involved with the case after Chapman's car had been found in a burned-out condition by an Indiana conservation officer. York felt the crime did not fit any normal vehicle theft pattern and that the arson attempt might be "an insurance job."

On August 15, 1977, after learning that Chapman's car was financed there, York telephoned the Indiana National Bank. He spoke with two people in the automobile loan department, a Mr. Lambert and Greg Austin. York identified himself as a State Police Officer and stated that he was seeking to learn the financial condition of Chapman's account as a possible motive in the arson case. In response to York's questions, one of the men, probably Austin, told York that the account had been designated for repossession but that Chapman had made a payment on August 2, 1977 to keep it from being repossessed. Austin told York, however, that payments were still due for July 15, 1977 and August 15, 1977. York testified that it was important to him that Chapman had just made a payment to keep the car from being repossessed and on that particular day, August 15, another payment was due. York felt that this financial condition, along with the other evidence he had, was enough to go to the prosecutor for a screening for probable cause of arson.

Chapman was subsequently charged with fourth degree arson. At trial Robert Purdue of the Bank testified as to the status of Chapman's account. Another witness, Bob

Buis, a claim representative from Chapman's insurance company, testified that while Chapman had filed a loss report, he had never filed a claim. At this point in the trial the prosecutor, Charles Gantz, moved for dismissal of the case against Chapman "for the reason that uh certain information upon [sic] which the state was [sic] believed to be true and accurate uh has not materialized and for this reason we feel that it is in the interest of justice and fair play that this matter be discharged, dismissed."

According to Sergeant York's recollection, the reason for dismissal was:

"Okay, on March the 15th, 1978, reading from my report here, during Mr. Chapman's trial, Mr. Perdue [sic] of Indiana National Bank armed with the account history gave an entirely different view of the account on the witness stand, stating that it had never been more than twenty-three days past due. After consulting with the prosecutor, the defense attorney and myself, we decided the prosecutor would move for dismissal with prejudice to the charge."

Charles Gantz was the prosecutor in the arson case against Chapman. Mr. Gantz's recollection of the reason for the dismissal of Chapman's criminal charge was that certain information pertaining to Mr. Chapman's car loan, as it came out on the witness stand, was not as the state had believed it to be. The expectation as to what the Bank's testimony would be, Gantz recalled, arose through conversations between York and the Bank. Gantz further stated the change in the Bank's testimony "completely destroyed the state's case."

In this civil action, despite motions for directed verdicts against all four of Chapman's theory, the jury returned a verdict of

actual damages of $39,750.00 and punitive damages of $50,000.00, indicating on the verdict form that the damages were based on all four theories.[1]

## DECISION

A directed verdict in favor of the defendant is proper only when there is absence of evidence or reasonable inferences in favor of the plaintiff upon the issue in question. *Large v. Gregory* (1981), Ind. App., 417 N.E.2d 1160. Here, the jury returned a verdict for Chapman based on all four theories of liability. Therefore, we must address the trial court's denial of the bank's motion for directed verdict with respect to each theory.

### I. *Invasion of Privacy*

In *Continental Optical Co. v. Reed* (1949), 119 Ind.App. 643, 86 N.E.2d 306, the court defined the right of privacy as:

"The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinay sensibility."

*Id.* 86 N.E.2d at 308. *See also* 27 I.L.E. *Torts* § 8 (1959).

The aspect of legitimate public concern is particularly important to the case at bar which involves law enforcement efforts. The facts surrounding the Bank's communication of the status of Chapman's loan account are not in dispute. At the time of the communication, Sergeant York was a state police officer conducting an arson investigation in which Chapman was a suspect. York identified himself to the

---

1. The jury returned the following verdict form:
 "We, the Jury, find for the plaintiff and against the defendant on the following theories of law:
 CHECK AS APPROPRIATE
 "X" 1. Breach of Implied Contract
 "X" 2. Invasion of Privacy
 "X" 3. Negligence .
 "X" 4. Slander

DATED: March 3, 1983"
 "We, the Jury, find for the Plaintiff and against the defendant and assess actual damages in the amount of $39,750.00.
DATED: March 3, 1983"
 "We, the Jury, find for the Plaintiff and against the defendant and assess punitive damages in the amount of $50,000.00.
DATED: March 3, 1983"

Bank's loan officer and asked questions about the status of Chapman's automobile loan. The Bank's answers were in response to a legitimate law enforcement inquiry and thus a matter of legitimate public concern. Chapman does not dispute this point. Such a communication is not an invasion of privacy under *Continental Optical.*

■ ˙ Our decision that legitimate inquiry into Bank records by law enforcement officials does not give rise to a private right of action for invasion of privacy is buttressed by cases that have addressed such inquiry in connection with fourth amendment claims.

In *Leonard v. State* (1968), 249 Ind. 361, 232 N.E.2d 882, our supreme court noted that a bank has lawful possession of bank records, and a person cannot claim an illegal search and seizure by police since fourth amendment rights are personal rights.[2]

In *U.S. v. Miller* (1976), 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 copies of checks, deposit slips, and other bank records were obtained through a subpoena *duces tecum* which the defendant claimed was defective. The United States Supreme Court reversed a lower court ruling that such bank records were in a "zone of privacy" protected by the fourth amendment. The court said the checks and deposit slips were the business records of the bank and not the private papers of the respondent.

The court also stated that all documents obtained by the police contained only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. The court concluded there is no legitimate expectation of privacy in such documents. *Miller* 425 U.S. at 442, 96 S.Ct. at 1624.

A similar situation was addressed in *Cox v. State* (1979), 181 Ind.App. 476, 392 N.E.2d 496, where a check and deposit slip were obtained from Cox's bank by police

without a search warrant. Cox sought to suppress the bank documents under the fourth amendment as the fruits of an illegal search. The court, citing *U.S. v. Miller, supra,* held that there is no legitimate expectation of privacy in such records and consequently no fourth amendment protection. *Cox,* 392 N.E.2d at 497.

Further comment on a related subject was offered by our supreme court in *In re Order for Indiana Bell Telephone etc.* (1980), 274 Ind. 131, 409 N.E.2d 1089 which involved long distance collect calls made by two escaped prisoners to their parents. The sheriff and prosecutor filed motions to produce the long distance telephone records of the escapees' parents. The trial judge granted the motion and issued a subpoena *duces tecum.* Indiana Bell refused to comply arguing such an intrusion by law enforcement impermissibly infringes on first amendment rights of freedom of speech and assembly. But the court held there was no legitimate expectation of privacy in telephone company toll billing records of numbers dialed on a telephone stating:

"Further, the United States Supreme Court has consistently held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."

*Id.* 409 N.E.2d at 1090. *Citing, Smith v. Maryland* (1979), 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220; *U.S. v. Miller* (1976), 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71. Our supreme court went on to discuss the reasonable expectation of privacy in such situations:

"We agree with the Court of Appeals for the District of Columbia in its statement: '[t]he general rule that a person has no Fourth Amendment basis for challenging subpoenas directed at the business records of third parties has been directly applied to toll billing records maintained by telephone companies. A telephone subscriber is fully aware when he places

**2.** *See Rakas v. Illinois* (1978), 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 which focused on the issue of whether the person seeking to challenge

the legality of a search as a basis for suppressing evidence was himself the victim of the search or seizure.

a long distance call that the telephone company will make a record of the call, that the record is the company's property, and that the Government has ready access to the record for law enforcement purposes. On this basis, the courts have uniformly held that subscribers have no Fourth Amendment basis for challenging Government inspection of their toll records, since subscribers, *like bank depositors, have taken the risk in revealing their affairs to third parties* that the information will be conveyed by that person to law enforcement officials, either *voluntarily* or in response to compulsory process.'" (Emphasis supplied.)

*In re Order for Indiana Bell Tel.* 409 N.E.2d at 1090.

The aforementioned cases although they involve a fourth amendment right to privacy, are in line with the definition of invasion of privacy found in *Continental Optical Co. v. Reed, supra,* and 27 I.L.E. *Torts* § 8. To reiterate, the Bank's communication was in answer to a legitimate investigation by law enforcement and was not a "publicizing of one's private affairs with which the public has no legitimate concern ... in such a manner as to cause outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Continental Optical,* 86 N.E.2d at 308. The Bank's motion for directed verdict should have been granted on the invasion of privacy theory.

## II. *Slander*

Next, the Bank argues the trial court erred in failing to grant its motion for directed verdict on the slander theory because the communication was made under qualified privilege.

■ The principle of a qualified privilege is firmly entrenched in Indiana defamation law and is summarized in 18 I.L.E. *Libel and Slander* § 52 (1959):

"The rule concerning a qualified privilege is that a communication made in good faith on any subject matter in which the party making the communication has an interest or in reference to

which he has a duty either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty, is privileged."

*quoted in Elliott v. Roach* (1980), Ind. App., 409 N.E.2d 661, at 672. *See also Indianapolis Horse Patrol, Inc. v. Ward* (1966), 247 Ind. 519, 217 N.E.2d 626; *Weenig v. Wood* (1976), 169 Ind.App. 413, 349 N.E.2d 235; 50 Am.Jur.2d *Libel and Slander* § 195 (1970); RESTATEMENT (SECOND) OF TORTS § 596 (1977). The underlying idea is that by reason of a public or social interest that is entitled to protection, immunity is granted from liability for defamation that would otherwise be actionable. 50 Am.Jur.2d *Libel and Slander* § 192 (1970). In *Elliott v. Roach, supra,* the court recognized that the privilege may protect communications made to one entitled to act in the public interest such as prosecuting attorneys and law enforcement officers. *See also, Hartsock v. Reddick* (1842) 6 Blackf. 255; 50 Am.Jur.2d *Libel and Slander* § 214 (1970). Later, in *Conn v. Paul Harris Stores* (1982), Ind.App., 439 N.E.2d 195, our court held that communications made by a store employee to a law enforcement officer concerning a possible shoplifter were subject to a qualified privilege. The court stated: "statements made in good faith pursuant to investigation by police of a crime are made in the performance of a public duty and are privileged." *Conn.* 439 N.E.2d at 200, *quoting Zakas v. Mills* (1978), 148 Ga.App. 220, 251 S.E.2d 135.

■ The undisputed facts indicate that the Bank's communication was made to Sergeant York during the course of a legitimate law enforcement investigation. Consequently, the Bank is entitled to the qualified privilege defined in *Conn, Elliott,* and 18 I.L.E. *Libel and Slander* § 52.

Our discussion does not end here. The concept of qualified privilege was explained by the court in *Elliott, supra:*

"As the phrase 'qualified or conditional privilege' suggests, such privilege does not change the actionable quality of the

words published, but merely rebuts the inference of malice that is imputed in the absence of privilege. 50 Am.Jur.2d *Libel and Slander* § 195 at 698 (1970). In an appropriate case, a trier of fact may determine the privilege was abused by excessive publication, by use of the occasion for an improper purpose, or by lack of belief or grounds for belief in the truth of what is said. W. Prosser, *supra*, at 792–96. And although the term 'malice' is frequently applied in viewing such acts, it appears 'the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which the privilege exists.' *Weenig v. Wood, supra* [169 Ind.App.] at 436, 349 N.E.2d at 249."

*Elliott,* 409 N.E.2d at 673.

■ The sole evidence offered by Chapman to show malice is his testimony that he "argued" at regular monthly intervals with the loan officer, Austin, about his account. This single assertion is not evidence that there was any "abuse of the privileged occasion by going beyond the scope of the purposes for which the privilege exists." *Weenig v. Wood, supra.* On the contrary, the facts indicate no abuse of privilege. The communication between the loan officer and Sergeant York was not initiated by the Bank. Rather it was *in response* to inquiry by York. This is not an indication of malice. *Weenig, supra.*

We find the communication by the Bank to be subject to a qualified privilege and further find no evidence of malice. Consequently we find the trial court erred in denying the Bank's motion for directed verdict on the theory of slander.

### III. Breach of Implied Contract

The Bank argues it had a public duty to disclose information to law enforcement officials acting in their official capacity and that this duty is evidenced on the face of Chapman's complaint.

Although the issue has not been addressed by Indiana courts, the question of what a bank implicitly warrants not to disclose has been decided in other jurisdictions. The first case to address a bank's obligation of confidence was *Tournier v. National Provincial & Union Bank of England* (1923), 1 K.B. 461. In that case the plaintiff failed to make good on an overdraft of his account. The Bank called his employer and disclosed that one of Tournier's checks had been made out to a bookmaker's account. As a consequence of the Bank's disclosure, Tournier was fired.

The *Tournier* court held that the Bank had breached an implied contract not to disclose such information, Lord Justice Scrutton stating:

"The Court will only imply terms which must necessarily have been in the contemplation of the parties in making the contract. Applying this principle to such knowledge of life as a judge is allowed to have, I have no doubt that it is an implied term of a banker's contract with his customer that the bank shall not disclose the account or, transactions relating thereto, of his customer...."

*Id.* at 480.

That a Bank has an implied contract not to disclose certain financial information pertaining to its depositors has been accepted by American courts and authorities. *See Suburban Trust Co. v. Waller* (1979), 44 Md.App. 335, 408 A.2d 758; *Graney Development Corp. v. Taksen* (1978), 92 Misc.2d 764, 400 N.Y.S.2d 717; *People v. Muchmore* (1979), 92 Cal.App.3d 32, 154 Cal.Rptr. 488; *Richfield Bank & Trust Co. v. Sjogren* (1976), 309 Minn. 362, 244 N.W.2d 648; *Burrows v. Superior Court of San Bernardino County* (1974), 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590; *Milohnich v. First National Bank of Miami Springs* (1969), Fla.Dist.Ct.App., 224 So.2d 759; *Peterson v. Idaho First National Bank* (1961), 83 Idaho 578, 367 P.2d 284; Mitchie *Banks and Banking* § 1 (1973); 10 Am.Jur.2d *Banks* § 332 (1963).

The point of dissension is under what particular circumstances will a bank be released from its implied duty not to disclose financial information about its customers.

In *Tournier, supra,* Lord Justice Atkins delineated four situations:

"(a) Where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure; (d) where the disclosure is made by the express or implied consent of the customer."

1 K.B. at 473. The statement in 10 Am. Jur.2d *Banks* § 332 (1963) is in agreement with *Tournier:*

"Indeed, it is an implied term of the contract between a banker and his customer that the banker will not divulge to third persons without the consent of the customer, express or implied, either the state of the customer's account or any of his transactions with the bank, or any information relating to the customer acquired through the keeping of his account, unless the banker is compelled to do so by court order, the circumstances give rise to a public duty of disclosure, or the protection of the banker's own interests requires it."

Notwithstanding the above authorities, some courts have been more restrictive of the circumstances under which a bank is relieved of its implied duty not to disclose. Most representative of these is *Suburban Trust Co. v. Waller, supra.*

"We specifically reject both the *Tournier* fourfold classification of qualifications to the implied contractual obligation of confidentiality owed by a bank to its depositors and the 10 Am.Jur.2d *Banks* § 332 grouping. We so do because we believe that those two authorities confer upon a bank entirely too much discretion. Were we to follow *Tournier* or 10 Am.Jur.2d *Banks* § 332, we would permit a bank to decide what is or is not in the public interest to disclose, and what is or is not in the best interest of the bank to disclose."

408 A.2d at 764. The court went on to conclude:

"We think that a bank depositor in this State has a right to expect that the bank will, to the extent permitted by law, treat as confidential, all information regarding his account and any transaction relating thereto. Accordingly, we hold that, absent compulsion by law, a bank may not make any disclosures concerning a depositor's account without the express or implied consent of the depositor."

*Id.* See also, *Burrows v. Superior Court of San Bernardino County, supra; Peterson v. Idaho First National Bank, supra.*

The *Suburban Trust* Court was further influenced by a statute recently enacted by the Maryland legislature that declared a bank may not disclose a customer's financial records unless (a) it has the customer's authorization or (b) the financial records are disclosed in response to a lawful subpoena, summons, warrant or court order.[3] Although this statute did not go into effect until 120 days after the onset of events in the *Suburban Trust* case, the court stated:

"By the enactment of Laws 1976, ch. 252, the people of Maryland, through their duly elected representatives, made explicit what had theretofore been implicit—banks may not, absent legal compulsion or express or implied authorization from the depositor concerned, reveal any information to any one, including police and other government agencies, about the depositor's dealings with the bank."

*Suburban Trust, supra,* 408 A.2d at 765. Finally the court noted its reasoning was in line with the Right to Financial Privacy Act, 12 U.S.C. § 3401 et seq. which outlines the situations under which federal government authorities may have access to an individual's financial reasons. Section 3402 of the Act provides as follows:

"[N]o Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution unless the financial records are reasonably described and—

(1) such customer has *authorized* such disclosure in accordance with § 3404 of this title;

---

**3.** *See* Md.Ann.Code art. 11, § 225 (1976).

(2) such financial records are disclosed in response to an *administrative subpoena or summons* which meets the requirements of § 3405 of this title;

(3) such financial records are disclosed in response to a *search warrant* which meets the requirements of § 3406 of this title; or

(4) such financial records are disclosed in response to a *judicial subpoena* which meets the requirements of § 3407 of this title; or

(5) such financial records are disclosed in response to a formal written request which meets the requirements of § 3408 of this title."

Although we are impressed with the *Suburban Trust* reasoning and above statutory authority, we note the absence of similar statutory law in Indiana. Further, to impose liability on a bank for breach of implied contract in a situation where a bank officer gives information to law enforcement without a subpoena or search warrant seems to conflict with the aforementioned Indiana law in the areas of invasion of privacy and slander.

The Indiana law of privacy recognizes an invasion only if the matter is not of public concern, and case law in our state indicates that a person does not legitimately expect his affairs with third parties to be kept private from law enforcement officers conducting an investigation. *See, Cox v. State, supra; In re Order for Indiana Bell Telephone etc. supra.*[4]

 Likewise, the law of slander in Indiana provides that statements made to a law enforcement officer involved in a legitimate investigation are made under qualified privilege. *Conn v. Paul Harris Stores, supra.* It would be incongruous for Indiana law to hold one has no expectation of privacy in bank affairs communicated to police and for the same law to imply into a contract a term which allows a bank

to divulge a customer's financial affairs to law enforcement only upon the service of a subpoena or warrant. Consequently, we decline to adopt the *Suburban Trust* rule in the face of contrary Indiana law. Such a change would be the province of the legislature. We hold a bank impliedly contracts only that it will not reveal a customer's financial status unless a public duty arises. Communication to legitimate law enforcement inquiry meets the public duty test. We hold the trial court erred in denying the Bank's motion for directed verdict on the theory of breach of implied contract.

Negligence

Chapman's complaint alleged the Bank "improperly, carelessly, negligently, and erroneously" informed Sergeant York that Chapman was behind several payments on his car loan account. The Bank argues there is no evidence of negligence and that it should have been granted a directed verdict on the negligence theory.

 In Indiana, the tort of negligence consists of (1) a duty owed to the plaintiff by the defendant, (2) a failure of the defendant to conform his conduct to the standard of care required by the relationship, and (3) an injury to the plaintiff resulting from the defendant's failure. *Miller v. Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701.

 A Bank's duty under a negligence theory is closely related to the duty imposed by Indiana slander and invasion of privacy law. Consequently, we define the Bank's duty along the lines of these two theories. A Bank has a duty not to disclose information concerning one of its customers unless it is to someone who has a legitimate public interest. *Continental Optical v. Reed, supra.* Further, when making a communication to one having legitimate public interest, the Bank operated

---

**4.** We reiterate our supreme court's statement in *Indiana Bell Telephone:*

"*bank depositors, have taken the risk in revealing their affairs to third parties* that the information will be conveyed by that person to law enforcement officials, either *voluntarily* or in response to compulsory process." (Emphasis added.)

*In re Order for Indiana Bell Telephone* 409 N.E.2d at 1090.

under a qualified privilege, as was the case here with Sergeant York conducting a legitimate law enforcement inquiry. *See, Elliott v. Roach, supra.* Thus, the Bank did not breach a duty of non-disclosure in releasing information to Sergeant York.

Chapman also argues, however, that the Bank has a duty to use reasonable measures to insure that a disclosure of customer financial status is *accurate*, that Indiana National failed to do so, and that the information given to Sergeant York was inaccurate.

There is no applicable case law in Indiana on the release of inaccurate financial information by a bank or credit agency. Related authority in other states holds that the release of credit information by a party having a legitimate interest is protected by qualified privilege. *See Rodrigues v. R.H. Macy & Co.* (1977), 88 Misc.2d 985, 391 N.Y.S.2d 44; *Petition of Retailers Commercial Agency, Inc.* (1961) 342 Mass. 515, 174 N.E.2d 376. The majority rule is that mere negligence resulting in inaccurate information does not meet the requisite level of malice needed to overcome a qualified privilege. *Rodrigues, supra; Petition of Retailers Commercial Agency, supra.* However, courts have held if a credit agency asserted information to be true without reasonable grounds or probable cause for doing so, it could be found to have acted with the equivalent of malice which is sufficient to overcome the qualified privilege. *See, e.g., Bloomfield v. Retail Credit* (1973), 14 Ill.App.3d 158, 302 N.E.2d 88.

In this case, we find no evidence that the Bank acted in a reckless or negligent manner. The sole testimony offered by Chapman to support an inference of negligence is Sergeant York's characterization of the Bank's testimony at the arson trial as contradictory to what he was told over the phone. An examination of the record reveals, however, that the Bank did not change its position. York testified as follows:

"I asked for the, I told the person that uh, I was working on an investigation where the car had been allegedly stolen and there had been an attempt to burn it and that uh, as part of my investigation, I would like to know the financial condition of that account. At that particular time. And uh, the notes I have here and this would have been August 15th, '77, was the, that that party told me that the account was due for 7–15 and 8–15, indicating to me July and August 15th."

■ At Chapman's arson trial, Robert Purdue of the Bank gave the following testimony:

"Q. Do you know the condition of the account during August of '77?

A. Factually, yes.

Q. Alright. What was the condition of the account during that month?

A. Well, on August the 7th uh of 1977, as far as uh the delinquent status of the account, the account was due for July 15th of 1977.

Q. What does that mean, sir?

A. Well, that means uh that the account ... well, the payment was past due uh 23 days."

Contrary to York's assertion, Purdue's statements do not conflict with the information given over the phone. Purdue stated that on August 7, 1977, Chapman owed one payment which had been due since July 15, 1977. York talked to the Bank on August 15, 1977 the day a second payment fell due and was informed that Chapman was behind two payments. These two statements are in agreement and do not raise an inference of negligence on the part of the Bank.

Further, Purdue did not, as York asserts, testify that Chapman was never more than 23 days behind on a payment. On cross-examination, Purdue disagreed with a similar characterization by Chapman's attorney:

"Q. In other words, [Chapman] was customarily a little late in making his payment, wasn't he?

A. It appears that way, yes.

Q. There isn't anything particularly unusual about that the payment was due for the August 7th period of time was late ... there isn't

anything unusual about the fact that particular payment was late, is there?

A. Not unusual.

Q. It was kind of a habit with him to be late?

A. Evidently.

Q. Okay. And he was never farther behind in any of that period of time than one payment, was he? In other words, he's never owed you two or three payments, at one time?

A. No, I wouldn't say that."

Thus, Purdue disagreed with the statement that Chapman was never more than one payment behind, and York's characterization of the Bank's statements as contradictory was in error.

■ The fact that the police and prosecution in Chapman's arson case were confused by or misunderstood the Bank's phone communication and subsequent testimony and dismissed the arson charges does not raise an inference that the Bank's communication was inaccurate as a result of negligence.

■ Also, the burden was on Chapman to show the Bank's communication was inaccurate. Other than his own statement that he disagreed with the Bank's figures, Chapman failed to introduce any evidence, such as a payment book or receipts to show that the Bank communicated inaccurate information. As we find no evidence that the Bank acted unreasonably in communicating information to York who was acting in a legitimate law enforcement capacity, we must conclude that the trial court erred in overruling the Bank's motion for directed verdict.

### Conclusion

In summary, we hold the Bank should have received a directed verdict on all four theories. Chapman's privacy was not invaded because the Bank's communication was in answer to a legitimate investigation by law enforcement. As such it was subject to a qualified privilege under Indiana slander law. This privilege was not lost as there was no showing of malice on the Bank's part. The status of Indiana law on the foregoing theories requires us to reject an implication that a Bank contracts not to divulge a customer's financial status to law enforcement without court authority. Instead we imply only that a Bank may not divulge unless it has a public duty to do so. Communications to legitimate law enforcement investigation meet the public duty test. Finally, we hold there was no evidence adduced at trial that the Bank acted negligently in its communication with Sergeant York.

Reversed.

CONOVER, J., concurs.

YOUNG, P.J., dissents with separate opinion (attached).

YOUNG, Presiding Judge, dissenting.

I dissent.

Under Indiana law, a banking customer has no Fourth Amendment right to privacy in a bank's records of his account. The absence of a constitutional right to privacy, however, does not define or limit the scope of a bank's implied contractual duty of confidentiality toward its customer. The scope of the bank's duty depends, not upon constitutional rights, but as in all questions of implied contractual terms, upon the intention of the parties to the contract.

"A bank customer's reasonable expectation is that, absent compulsion by legal process, the matters he reveals to the bank will be utilized by the bank only for internal banking purposes." *Burrows v. Superior Court of San Bernardino County* (1974), 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590. In this case, INB provided financial information concerning Chapman pursuant to a police officer's informal oral request. This action breached the bank's implied duty of confidentiality.

A review of Indiana cases on invasion of privacy reveals no incongruity in a determination that a bank's disclosure of information without legal compulsion constitutes a breach of contractual duty although it does

not violate the customer's Fourth Amendment rights.[1] In *Leonard v. State* (1968), 249 Ind. 361, 232 N.E.2d 882, our supreme court addressed the issue of whether the introduction into evidence of a bank's records in a criminal case violated a defendant's constitutional rights under the Fourth and Fifth Amendments. The court confined its inquiry to the "question of whether the bank lawfully had possession of the records," since the defendant could not claim an illegal search and seizure if the records were not in his possession. *Id.* 232 N.E.2d at 885.[2] The court did not address the existence or scope of a bank's implied contract of confidentiality.

Similarly, in *In re Order for Indiana Bell Telephone* (1980), 274 Ind. 131, 409 N.E.2d 1089, our supreme court asked only whether release of telephone records infringed upon a customer's freedom of speech and association guaranteed by the State and Federal Constitutions. The court concluded that the "expectation of privacy protected by the Fourth Amendment attaches to the content of the telephone conversation and not to the fact that a conversation took place." *Id.* 409 N.E.2d at 1090. The dicta in *Indiana Bell* cannot fairly be held to imply that a bank has no contractual duty to keep account information confidential absent legal compulsion since the issue before the court was not the contractual rights of the parties, but, rather, the scope of the customer's constitutional rights. Moreover, the issue of compliance with an informal request for information was not before the court since the request was presented as a subpoena *duces tecum.*

Neither does *U.S. v. Miller*[3] (1976), 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71, limit the scope of a bank's implied contract of confidentiality. In *Miller*, a banking cus-

tomer charged that the bank's compliance with subpoenaes *duces tecum* violated his Fourth Amendment rights. The court reasoned that a depositor takes the risk that his bank will divulge account information since the transfer of information to a third party extinguishes the customer's Fourth Amendment rights. Not only did the court limit its inquiry to Fourth Amendment rights, but it also distinguished cases, such as the present one, involving "statements to police in response to an informal oral request for information." *Id.* 96 S.Ct. at 1625 n. 7. The Court noted that "the court in *Burrows* found it 'significant ... that the bank [in that case] provided the statements to the police in response to an informal oral request for information'." *Id.* In contrast, the government in *Miller* "exercised its powers through narrowly directed subpoenaes *duces tecum* subject to the legal restraints attendant to such process."

Neither does Indiana slander law define the contractual liability of a bank toward its customer. Even though a communication made to law enforcement officers in good faith will not support a charge of slander, that communication may nevertheless breach the implied contract between the parties if it contravenes their intentions.

Given the persuasive reasoning of the court in *Suburban Trust Co. v. Waller* (1979), 44 Md.App. 335, 408 A.2d 758, and the example of the Financial Privacy Act, 12 U.S.C. § 3401, *et seq.,* together with the absence of any Indiana statutory or case law to the contrary, we should recognize that a bank's duty of confidentiality to its customers does not end upon a policeman's informal, oral request for information. "To permit a police officer access to these records merely upon his request, without

---

**1.** Fourth Amendment cases in no way imply that a bank has a duty to comply with an informal police request. Indeed, a bank has a contractual duty to its customers *not* to comply with such a request.

**2.** *See also Cox v. State* (1979), 181 Ind.App. 476, 392 N.E.2d 496, where the first district, in addressing a similar Fourth Amendment claim stated, "Fourth Amendment rights are personal

rights which, like some other constitutional rights, may not be vicariously asserted." *Id.* 392 N.E.2d at 497, *quoting Rakas v. Illinois* (1978), 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387.

**3.** The Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401–3421, was designed to limit the holding in *Miller. Hancock v. Marshall,* 86 F.R.D. 209 (D.D.C.1980).

any judicial control as to relevancy or other traditional requirements of legal process, and to allow the evidence to be used in any subsequent criminal prosecution against a defendant, opens the door to a vast and unlimited range of very real abuses of police power." *Burrows*, 529 P.2d at 596. The trial court in this case correctly refused to grant a directed verdict on the breach of contract issue.