DECISION
This action comes before the Court on the defendant's motion for summary judgment. The plaintiffs, Read Lundy, Inc. ("Read 
Lundy") and Cliff McFarland ("McFarland"), have brought suit against the defendant, The Washington Trust Company of Westerly ("Washington Trust"), for claims arising out of a loan made by First Bank and Trust Company ("First Bank"), the predecessor in interest to Washington Trust, to Consigned Systems, Inc. ("CSI"), a direct competitor of Read 
Lundy. In their first amended complaint, plaintiffs state four causes of action: breach of implied contract, violations of the Uniform Trade Secrets Act ("UTSA"), tortious interference with contract, and civil conspiracy. After reviewing the record and applicable law, this Court grants the defendant's motion for summary judgment in its entirety.
 FACTS AND TRAVEL
Much of the history relevant to this case is exhaustively set forth in related litigation and is incorporated herein by reference by this Court. See McFarland v. Brier, 769 A.2d 605 (R.I. 2001); McFarland v.Brier, No. 96-1007, 1999 R.I. Super. LEXIS 32 (filed July 15, 1999);McFarland v. Brier, No. 96-1007, 1998 R.I. Super. LEXIS 68 (filed May 13, 1998) (the "McFarland cases"). Other pertinent facts, inclusive of this history, are set forth in the defendant's prepared statement of facts and are likewise incorporated herein by reference. See Statement of Undisputed Facts in Support of the Washington Trust Company of Westerly's Motion for Summery Judgment (August 26, 2002).[1]
The history of this case reveals that Dennis Bibeau ("Bibeau"), President of Read Lundy, entered into a stock purchase agreement with the company's sole shareholder, McFarland. The agreement contained a noncompetition covenant that prohibited Bibeau from competing with Read Lundy for its existing customers should he leave the company. To finance his buyout of McFarland, Bibeau applied for a loan from First Bank. Included in Bibeau's loan application with First Bank were Read Lundy's customer and vendor lists, profit margins, sales volumes, inventory lists, product costs, and pricing data. Michael Brier ("Brier"), Read Lundy's outside accountant, prepared the financial statements that Bibeau submitted to First Bank. Robert McCormick ("McCormick"), a loan officer for First Bank, prepared a loan offering and made a recommendation to the loan committee in favor of making the loan to Bibeau. First Bank agreed to finance Bibeau's buyout of McFarland conditioned on McFarland agreeing to certain terms, including subordinating his interest to First Bank's security interest. A subsequent disagreement between First Bank and McFarland regarding the security interest on the loan prevented the loan from closing. Thereafter, McFarland removed Bibeau as President of Read Lundy, prompting Bibeau's resignation in August 1995 and the departure of Brier.
Upon leaving Read Lundy, Bibeau immediately began soliciting Read Lundy customers, most notably TPI, while Brier began organizing a start-up company. In September 1995, Brier formed CSI — a company designed to compete directly with Read Lundy — and hired Bibeau. See McFarland cases, supra. In October 1995, Bibeau filed a declaratory judgment action in federal court against McFarland by which he sought a determination that their noncompetition agreement was void. McFarland and Read Lundy filed a counterclaim alleging violation of the noncompetition agreement and misuse of Read Lundy's confidential information.[2] CSI submitted bids to four of Read 
Lundy's customers in October and November of 1995. In response to this competition and the threat of losing its customers, Read Lundy implemented across the-board price cuts.
In October 1995, CSI contacted First Bank about applying for a loan. In November 1995, CSI applied to First Bank for a loan to finance CSI's business ventures and began working with McCormick to secure the funds. Together with its loan application, CSI submitted a business plan to First Bank that listed several Read Lundy customers as part of its customer base. To determine CSI's prospects and the feasibility of granting the loan, McCormick used financial information concerning Read Lundy's business operations that had been supplied to First Bank by Bibeau in connection with his proposed buyout of McFarland. McCormick was aware of the rather contentious history among Brier, Bibeau, McFarland, and Read Lundy.
In March 1996, McFarland and Read Lundy sued CSI, Brier, Brier's accounting firm, and Brier and Company in state court and received a temporary restraining order prohibiting CSI and Brier from soliciting Read Lundy's customers.[3] In June 1996, First Bank granted CSI a five hundred thousand dollar loan, the use of which was restricted to certain purposes, mainly the purchase of inventory. The loan documents contain a covenant that CSI will not solicit customers of Read 
Lundy.
Plaintiffs Read Lundy and McFarland filed this action against First Bank (now Washington Trust) in June 1999 alleging that First Bank (1) breached its implied contract with plaintiffs not to use Read 
Lundy's confidential business information in its consideration of a competing customer's loan request, (2) tortiously interfered with the plaintiffs' contractual relationships with Brier, Bibeau and certain customers by making the loan to CSI, and (3) conspired with Brier, Bibeau, and CSI to violate the UTSA, tortiously interfere with plaintiffs' contracts with Bibeau and their customers and violate Brier's professional duties. In December 2001, the plaintiffs amended their complaint to add a cause of action against First Bank for violation of the UTSA. In April 2002, Washington Trust became the successor in interest to First Bank by acquiring all of the latter bank's outstanding stock and was thereafter substituted as the party defendant in this action by stipulation.
In August 2002, the defendant moved for summary judgment as to all of the plaintiffs' claims. Plaintiffs objected to this motion. This Court has received and reviewed the exhaustive memoranda and extensive exhibits submitted by the parties in connection with this motion and has considered their lengthy oral arguments.[4]
SUMMARY JUDGMENT
"Summary judgment is a proceeding in which the proponent must demonstrate by affidavits, depositions, pleadings and other documentary matter . . . that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact." Palmisciano v.Burrillville Racing Ass'n, 603 A.2d 317, 320 (R.I. 1992) (citingSteinberg v. State, 427 A.2d 338 (R.I. 1981)); Super. Ct. R.Civ.P. 56(c). "[A] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions." DeCarli v. Webber,784 A.2d 288, 290 (R.I. 2001) (quoting Accent Store Design, Inc. v.Marathon House, Inc., 674 A.2d 1223, 1225 (R.I. 1996)). "Rather, by affidavits or otherwise [the opposing party has] an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact." Providence Journal Co. v. Convention Center Authority,774 A.2d 40, 46 (R.I. 2001) (quoting Bourg v. Bristol Boat Co.,705 A.2d 969, 971 (R.I. 1998)). "[S]ummary judgment is appropriate when, viewing the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party, the court determines that there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law." Tavares v. Barbour,790 A.2d 1110, 1112 (R.I. 2002) (quoting Delta Airlines, Inc. v. Neary,785 A.2d 1123, 1126 (R.I. 2001)).
ANALYSIS
Plaintiffs' Claims of Breach of Implied Contract[5]
In Count I of their first amended complaint, plaintiffs allege that "[b]y its use of Read Lundy's financial information in its consideration of the loan to CSI, Inc., First Bank breached its contractual obligations to Read Lundy, and Read Lundy was damaged thereby." First Amended Complaint, Count 1, § 63. The gravamen of plaintiffs' claim in this regard is that First Bank impliedly contracted with the plaintiffs to use Read Lundy's business and financial information that Bibeau submitted in connection with his loan application solely in deciding whether to finance his proposed buyout of McFarland. The plaintiffs contend, therefore, that First Bank's use of that loan application information "in consideration" of its loan to CSI (and ultimately in granting CSI's loan request) breached its implied contract with the plaintiffs to use that confidential information only in connection with the loan for which it was submitted. Id.
In moving for summary judgment, the defendant responds that there is insufficient evidence from which a trier of fact could infer the existence of an implied agreement between the parties to use the subject information solely in connection with the proposed financing for the buyout. In addition, the defendant argues that First Bank violated no legal duty by using the information internally in connection with another proposed commercial loan transaction. According to the defendant, such internal use of commercial customer information, as opposed to information from individual borrowers, is consistent with routine business operations.
Under Rhode Island law, an implied contract "is a form of express contract wherein the elements of the contract are found in and determined from the relations of and the communications between the parties, rather than from a single clearly expressed written document." MarshallContractors, Inc. v. Brown Univ., 692, A.2d 665, 669 (R.I. 1997). InBailey v. West, the Rhode Island Supreme Court stated:
 So, such a contract is dependent on mutual agreement or consent, and on the intention of the parties; and a meeting of the minds is required. A contract implied in fact is to every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown. Such a contract does not arise out of an implied legal duty or obligation, but out of facts from which consent may be inferred; there must be a manifestation of assent arising wholly or in part from acts other than words, and a contract cannot be implied in fact where the facts are inconsistent with its existence.
105 R.I. 61, 64, 249 A.2d 414, 416 (1969) (quoting 17 C.J.S. Contracts
§ 4 at 557-60)
(emphasis added).
Looking to the present case, the Court notes that the plaintiffs have failed to adduce any facts that would demonstrate a meeting of the minds and an agreement between the plaintiffs and First Bank to prohibit the bank from using Read Lundy's loan application information internally in consideration of another commercial borrower's loan request. The plaintiffs have failed to present any evidence of writings or conversations between the parties wherein First Bank stated that it would restrict its internal use of their information. In addition, there is no evidence of acts on the part of the parties from which such consent could be inferred. Indeed, the evidence suggests that the facts may well be inconsistent with such an inference of consent. Plaintiffs had knowledge of First Bank's use of their financial information in connection with CSI's loan request from the deposition testimony of McCormick in 1996, and there is no evidence that plaintiffs quarreled with that use at that time. Deposition of Robert D. McCormick at 85, 87, C.A. No. 95-512-L/95-538-L (March 1, 1996) (Defendant's Exhibit 13); Deposition of Robert D. McCormick at 35, 37, C.A. No. 95-538-L (January 25, 1996) (Defendant's Exhibit 18).
The plaintiffs nonetheless suggest that First Bank's confidentiality policy, industry norms, and the bank's own admissions evidence an implied agreement between the parties to that effect. First Bank's loan policy, however, is irrelevant to the present claim. The bank's loan policy to which the plaintiffs cite is geared toward preventing bank employees from using customer information for their personal benefit, see Djowharzadehv. City Nat. Bank Trust Co., 646 P.2d 616 (Okla.Ct.App. 1982), but it does not place any restrictions on the bank's internal use of the information of a commercial borrower in conjunction with another commercial borrower's loan request.
Regarding industry norms, the plaintiffs' expert, Richard Clarke ("Clarke"), has stated in conclusory fashion that First Bank departed seriously from accepted banking procedures by granting a loan to CSI and by breaching confidentiality requirements. See Plaintiffs' Exhibit 1. Clarke's report, however, does not touch upon the issue here- whether it is accepted banking practice to use one commercial loan applicant's information internally in consideration of a competing commercial applicant's loan request.
Regarding the defendant's admissions, the plaintiffs assert that the defendant admitted in its pleadings that Bibeau gave Read Lundy's financial information to First Bank solely for his loan application. This admission, however, falls short of manifesting First Bank's assent that it would not use that information for any other purpose. The plaintiffs fail to make the distinction that the mere giving of information to First Bank for one purpose does not legally preclude the bank from using the information for other purposes. Thus, even when viewed in a light most favorable to the plaintiffs, the evidence presented to this Court is insufficient to establish a genuine issue of material fact as to the existence of an implied agreement between the plaintiffs and First Bank that the bank would be barred from using the applicant's commercial loan application information internally in its consideration of a competing commercial customer's loan request.
Perhaps cognizant of these evidentiary deficiencies in the record as to the existence of an implied in fact contract between the parties, the plaintiffs seem to suggest that there is a legal duty on the part of a bank not to use confidential loan information from a commercial applicant internally in its consideration, and ultimately, in its granting, of a competing commercial customer's financing request. Plaintiffs argue that this legal duty creates an implied contract between plaintiffs and First Bank.
In Bailey v. West, the Rhode Island Supreme Court stated, unequivocally, that an implied in fact contract, which is what the plaintiffs argue exists here, cannot arise out of an implied legal duty or obligation but only out of facts from which consent may be inferred. 105 R.I. at 64, 249 A.2d at 416. In the later case of O'Coin v. WoonsocketInst. Trust Co., however, the Court left open the question of whether there exists a duty on the part of a bank not to disclose financial information about a debtor and whether such a duty, were it deemed to exist, would sound in contract or tort. 535 A.2d 1263, 1266-67 (R.I. 1988).
Assuming, without deciding, therefore, that a bank could be found to have a duty to maintain confidentiality that could be the basis of a claim for breach of implied contract should the bank violate that duty, the question then becomes whether the bank in this case had a legal duty not to use the plaintiffs' commercial loan information internally in its consideration of a competing commercial customer's loan request. The plaintiffs have failed to convince this Court that such a legal duty exists.
The plaintiffs simply fail to cite any case law holding that a bank may not use a customer's commercial loan application information internally in consideration of another commercial customer's loan application. The plaintiffs also fail to cite any laws or regulations restricting banks from using a commercial borrower's information internally in the processing of unrelated loans. More specifically, the plaintiffs cite no case law holding that banks have any implied contractual duties in this regard. Instead, the plaintiffs premise their breach of contract claim solely on cases that impose a legal duty on banks (usually in tort rather than in contract) not to disclose confidential information received from individual customers, as opposed to commercial borrowers, to third parties.[6]
Focusing on the legal concept of duty, the Rhode Island Supreme Court has noted, albeit in a tort rather than in a contract case, that the "question of `duty' is decided by the court, not the jury." Banks v.Bowen's Landing Corp., 522 A.2d 1222, 1226 (R.I. 1987) (quoting Ballardv. Uribe, 715 P.2d 624, 628 n. 6 (Cal. 1986)). In Banks, the Supreme Court recognized that no precise rule exists for determining the existence of a duty, but it did give examples of factors that a court may consider in its analysis:
 (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach.
Id. at 1225. The Rhode Island Supreme Court stated that:
 a court's task-in determining `duty'-is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular
defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.
Id. at 1226 (emphasis in original).
In this case, it is foreseeable that a commercial customer of a bank could be harmed by the bank making a loan to that customer's direct competitor and that the risk of such harm could be greater if the bank relied on the customer's loan information to grant the competitor's loan request. Banks, however, are not prohibited from making loans to their customer's competitors. Whether, in fact, the customer would suffer injury were such a loan to be made is uncertain and not dictated exclusively by the bank's use of that customer's financial information. As such, there appears to be a somewhat tenuous connection between a defendant's conduct in using the information and any injury that the customer may sustain.
If this Court were to find an implied contractual duty prohibiting a bank's internal use of a commercial loan applicant's information in its consideration of a competing commercial customer's loan request, the resulting burden could have profound consequences-not only upon the defendant bank here but on all banks and the community at large. These concerns were articulated by the Third Circuit in Washington Steel Corp.v. TW Corp., 602 F.2d 594 (3rd Cir. 1979) (overruled on other grounds byClark v. K-Mart Corp., 979 F.2d 965, 967 n. 4 (3rd Cir. 1992)). InWashington, the Third Circuit tackled the issue of the misuse of commercial customer information in the banking industry. The plaintiff corporation was a customer of the defendant bank. The plaintiff sought to prohibit the defendant bank from loaning money to a competitor of the plaintiff corporation that wanted to finance its acquisition of the plaintiff corporation. The defendant bank used confidential information obtained from the plaintiff corporation to determine the feasibility of granting its customer's competitor a loan. In addressing the alleged misuse of customer information by a bank for the benefit of that customer's competitor, the Court stated:
 [T]he promulgation of a rule restricting the dissemination of confidential information within the loan department of a bank is neither the proper province of a court nor an appropriate subject for state law adjudication. More critically, the adoption of such a rule would make unwise banking policy. To prohibit a bank from considering all available information in making its own loan decisions might engender one or both of two undesirable outcomes. First, it might force banks to go blindly into loan transactions, arguably violating its duties to its own depositors. Alternatively, such a rule might discourage banks from lending money to any company which expresses an interest in purchasing shares of stock of another of the bank's customers. The adverse implication of this result for the free flow of funds is precisely the reason why we rejected the [p]er se [breach of fiduciary duty] rule urged by [the plaintiff]. Bank credit is, after all, the largest part, by far, of the national money supply.
Id. at 603. The Third Circuit further stated that "[c]ompanies seeking to insulate themselves from takeovers, or even from ordinary competition, could simply arrange for a series of loans from most of the major banks, supplying those banks with the requisite non-public information . . . . the banks would thereby be foreclosed from financing competitors and potential acquirers of the borrowing firms." Id. at 601.
The Third Circuit also stated that this area of banking and lending is "archetypically within the domain of legislative judgment. A legislature is best suited to consider the delicate financial issues at stake and strike a balance between sound economics on the one hand, and expectations of loyalty on the other." Id. Focusing on the national rather than the state scope of the issue, the Court stated that "[g]iven the need for uniform rules in an area so vital to our national economy as banking, any state common law rule that we might imply would likely give way to the preemptive force of federal law." Id.[7]
This Court notes that the facts in Washington could be deemed even more compelling for imposition of a duty restricting a bank's use of a commercial borrower's information than the facts in the present case. Here, the issue is the bank's use of a customer's loan information in granting a loan to that customer's competitor; in Washington, the issue was the bank's use of a customer's financial information in granting a loan to that customer's competitor so that it might acquire the other customer. Yet, for the policy reasons previously cited, the Third Circuit found no cause of action as long as the bank only used the information internally in its loan department.
The rationale of the Court in Washington for not finding a common law duty on the part of a bank to refrain from using commercial information from a customer in its consideration of a loan request from a competing customer is noteworthy. Indeed, it is reflected in the Rhode Island Supreme Court's pronouncements in O'Coin, wherein the Court referenced the English case of Tournier v. National Provincial and Union Bank ofEngland, 1 K.B. 461 (1923), with regard to the implied contractual duty of confidentiality imposed on banks with respect to disclosure of customer information:
 I think it safe to say that the obligation not to disclose information such as I have mentioned is subject to the qualification that the bank have the right to disclose such information when, and to the extent to which it is reasonably necessary for the protection of the bank's interests, either as against their customer or as against third parties in respect of transactions of the bank for or with their customer, or for protecting the bank, or persons interested, or the public, against fraud or crime.
535 A.2d at 1266 (quoting Tournier, 1K.B. at 486). In O'Neil v.Q.L.C.R.I., Inc., the Court stated that "[t]he mere fact that a communication [to a bank] was made in express confidence, or in the implied confidence of a confidential relationship, does not create a privilege" nor is there a common law "privilege for communication with a bank." 750 F. Supp. 551, 556 (D.R.I. 1990). These courts thus seemingly recognize the absence of a duty on the part of banks to maintain as confidential that information that might be necessary for a bank to use or disclose to protect the bank, its shareholders or the public at large. Imposition of such a duty would do little to prevent future harm and could have grave consequences for lenders and the public. This Court thus follows the holding of the Court in Washington and refuses to find an implied contractual duty on the part of banks that restricts the internal use of commercial loan application information within a bank's loan department.
Accordingly, there is insufficient evidence in the record, even when viewed in a light most favorable to plaintiffs, from which a jury could infer the existence of an implied agreement between the plaintiffs and First Bank that the bank would not use internally Read Lundy's financial information that was submitted by Bibeau in connection with his application for financing for the buyout of McFarland in consideration of CSI's competing commercial loan request. Even assuming that plaintiffs' claim for breach of implied contract could be premised on the violation of a legal duty, as opposed to breach of an implied in fact contract, this Court finds that a bank generally (and First Bank in particular) has no legal duty to refrain from using a commercial loan applicant's information internally in consideration of another competing commercial loan applicant's financing request. Absent such a duty, there is no implied contract between plaintiffs and First Bank, as a matter of law, on which plaintiffs can premise their breach of contract claims. The defendant's motion for summary judgment is thus granted as to plaintiffs' claims of breach of implied contract.
 Plaintiffs' Claims for Violation of the Uniform Trade Secrets Act
The defendant has moved for summary judgment as to plaintiffs' claims that First Bank violated the Uniform Trade Secrets Act, R.I. Gen. Laws §§ 6-41-1 et seq. (1956) ("UTSA"), embodied in Count 4 of the first amended complaint, on the grounds that the claims are barred by the applicable statute of limitation. It argues that plaintiffs had knowledge of First Bank's use of their alleged confidential information in considering CSI's loan application more than three years before they filed their original complaint so as to make their filing of a UTSA claim untimely. Plaintiffs argue that the statute of limitation does not begin to run until First Bank actually made the loan, which was within the applicable limitation period. They contend, therefore, that their UTSA claims were timely filed.
The UTSA proscribes the misappropriation of trade secrets. Under the UTSA, "misappropriation" is defined, in pertinent part, as follows:
(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who:
(A) Used improper means to acquire knowledge of the trade secret; or
(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: . . . .
(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .
Id. § 6-41-1. A trade secret is defined, in relevant part, as "information . . . that [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Id. § 6-41-1(4)(i). In addition, to be considered a "trade secret," the information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Id. § 6-41-1(4)(ii). The statute of limitation for bringing a claim under the UTSA is "three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Id. § 6-41-6. Under the UTSA, "a continuing misappropriation constitutes a single claim." Id.
The UTSA further states that it "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the [misappropriation of trade secrets] among states enacting it." Id.
§ 6-41-8. While the Rhode Island Supreme Court has not yet had occasion to interpret or apply the statute of limitation provision of the Act, other jurisdictions that have adopted the UTSA have concluded that its discovery rule does not allow an injured party to wait once it discovers misuse. See Intermedics, Inc. v. Ventritex, Inc.,822 F. Supp. 634 (N.D.Cal. 1993); Glue-Fold, Inc. v. Slautterback Corp.,82 Cal.App.4th 1018 (Cal.Ct.App. 2000); McLeod v. Northwest Alloys,Inc., 969 P.2d 1066 (Wa. Ct. App. 1998).[8] "If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation." AlamarBiosciences, Inc. v. DIFCO Lab., Inc., C.A. No. CIV-S-1856 DFL PAN, 1995 U.S. Dist. Lexis 21342 (E.D.Cal. filed Oct. 13, 1995).
Moreover, it does not matter if an aggrieved party does not realize that the use "legally constituted a misappropriation of trade secrets . . . as long as [the party] knew the facts which could give rise to such a claim." Chasteen v. Unizia Jecs Corp., 216 F.3d 1212, 1218 (10th Cir. 2000). Courts have rejected the notion that the "statute of limitations only begins running when a plaintiff can unassailably establish a legal claim for trade secret misappropriation, [as that] would effectively eviscerate the statute of limitations in all cases in which the plaintiff never discovers "smoking gun" evidence of misappropriation." Chasteen,
216 F.3d at 1218; see also Intermedics, 822 F. Supp. at 641-42 (rejecting the argument that a cause of action cannot accrue for statute of limitation purposes until plaintiff has a winning claim as fundamentally wrong as a matter of law for it would prohibit defendants from using the statute for protection); Sokol Crystal Prod., Inc. v. DSC CommunicationsCorp., 15 F.3d 1427 (7th Cir. 1994) (holding that misappropriation of trade secrets occurred not when the defendant sold a product that it developed using plaintiff's confidential information but when it used that information in developing the product).
In this case, plaintiffs contend that First Bank used Read 
Lundy's confidential loan information in considering the financing request of CSI, in breach of an implied contractual agreement between the parties. See First Amended Complaint, Count 1, § 63. Plaintiffs further argue that this alleged misuse of confidential loan information by First Bank and the bank's resulting loan to CSI and assistance to Brier, CSI and Bibeau in their misuse of Read Lundy's information constituted a misappropriation of their trade secrets in violation of the UTSA. See First Amended Complaint, Count 4, §§ 72-76.
It is abundantly clear, therefore, that the plaintiffs do not simply challenge First Bank's making of the loan to CSI as a misappropriation of trade secrets violative of the UTSA; plaintiffs also challenge the use of their confidential loan information by First Bank, prior to making the loan, in its consideration of CSI's loan request and its decision to make that loan. Plaintiffs can hardly suggest otherwise. If the gravamen of their stated cause of action for violation of the UTSA were solely the making of the loan to CSI (and not First Bank's use of confidential loan information in deciding whether to make the loan), then plaintiffs would have to sanction a bank's internal use of their confidential information as long as that use caused them no harm. Such an argument would run directly counter to plaintiffs' claims of breach of implied contract and undercut their characterization of the information at issue as constituting "trade secrets." It also would eviscerate the purpose of the UTSA — which is not only to allow for an award of damages should a party actually misappropriate another party's trade secrets but to protect a party from such injury by allowing that party to seek injunctive relief against any "actual or threatened misappropriation." R.I. Gen. Laws § 6-41-2 (emphasis added). The argument by plaintiffs in this case that there was no violation of the UTSA until First Bank made the loan to CSI suggests that there could be no threatened use or misappropriation of their confidential information by the bank that could have triggered an action by plaintiffs for injunctive relief under the UTSA.
In reality, however, if it was wrong for First Bank to make the loan to CSI based on a misuse or misappropriation of plaintiffs' confidential loan information, then it was equally wrong for the bank to use that information, prior to making the loan, in considering CSI's loan request. Based on the facts known to the plaintiffs, they did not have to wait until First Bank made the loan to seek judicial relief. InIntermedics, the Court held that the "language of the USTA makes no reference to an `appreciable harm' requirement" and that mere use "gives rise to access to judicial relief." Intermedics, 822 F. Supp. at 642. The Court stated further that "there is, as a matter of law, sufficient harm or threat of harm in disclosure [or use] of a real trade secret to a competitor for a cause of action to accrue." Id. Once the plaintiffs knew that First Bank was using their confidential information in considering CSI's application for financing, they could have sought to enjoin the bank from making the loan or brought the instant action at that time.
Here, the actual use of the plaintiffs' information occurred when McCormick first used that information to process CSI's loan request; the granting of the loan was a mere continuation of that first alleged misappropriation. The statute, after all, declares a continuing misappropriation to be a single claim. R.I. Gen. Laws § 6-41-6. The question, therefore, is whether plaintiffs knew or should have known of this use or alleged misappropriation of their alleged trade secret information by First Bank more than three years before they filed their complaint in June 1999. Under the UTSA, the statute of limitation for bringing a claim is "three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."Id. § 6-41-6.
The defendant argues that plaintiffs had knowledge of First Bank's use of Read Lundy's alleged confidential business information in connection with CSI's loan request as of January 1996. Read Lundy's counsel posed the following questions to McCormick in his deposition of January 25, 1996 that took place in connection with the previously litigated McFarland cases:
 Q. Do you keep a separate file for this particular pending loan application? For CSI, I'm sorry.
 A. Yes. This whole file has been with Mr. Hague[9]
for, for a while now.
 Q. Is there any information, any financial information of Read Lundy that's contained in Consigned Systems, Inc., [sic] loan file?
 . . . . A. Yes, there is just as of the last day or two.
 Q. Could you explain that, as of last day or two?
 A. I asked Mr. Hague to send me a copy of, of the Read Lundy writeup [sic] so that I could look at the ratios, the industry ratios.
 Q. Okay, for comparative purposes?
 A. Yes.
Deposition of Robert D. McCormick at 35, 37, C.A. No. 95-538-L (January 25, 1996) (Defendant's Exhibit 18). Moreover, while plaintiffs state that they did not have notice of First Bank's use of Read Lundy's information from the January 1996 deposition, they concede that they had knowledge of the alleged misuse of the information by First Bank as of March 1996. In the March 1, 1996 deposition of McCormick, plaintiffs' counsel asked the following questions:
 Q. Okay, in the process of approving that loan, at one point you asked Mr. Hague to pull for you a document out of the Read Lundy loan file which he had in his office; do you remember that?
 A. Yes
 . . . . . Q. Have you referred to any Read Lundy information, either in your file or provided to you by Mr. Brier, in the course of your consideration of the Consigned Systems Loan?
 A. Yes.
 Q. What Read Lundy information?
 A. I looked at the margins.
 Q. And where did you get that information?
 A. From the Read Lundy write-up
 . . . . . Q. Okay. Basically, Consigned Systems is going to be in the same industry, you would expect the margins to be the same; is that the way you referred to it?
 A. I would expect them to be in some ways similar to the Read Lundy, closer to the Read Lundy numbers than the RMA[10] numbers.
 Q. So a better check than the industry standard, the RMA numbers, is that what you are saying?
 A. Yes, yes.
 Q. A better check in terms of your analysis of CSI?
 A. That is correct because of the consignment nature, which the industry supplier does not do.
Deposition of Robert D. McCormick at 85, 87, C.A. No. 95-512-L/95-538-L (March 1, 1996) (Defendant's Exhibit 13). Based on this deposition testimony, plaintiffs admit that McCormick used Read Lundy's alleged confidential information to support making the loan to CSI.[11]
As the plaintiffs were aware of the alleged misappropriation of Read Lundy's confidential information by First Bank by March 1996, at the latest, the three-year statute of limitation had run by the time the plaintiffs filed their original complaint against First Bank in June 1999. The plaintiffs' claims under the UTSA are thus untimely, and the defendant's motion for summary judgment is granted as to these claims.
 Plaintiffs' Claims of Tortious Interference with Contractual Relations
In its first amended complaint, plaintiff Read Lundy claims that First Bank tortiously interfered with its contractual relationships with Brier, Bibeau, and its customers. First Amended Complaint, Count 2, §§ 64-66. Plaintiff McFarland claims that First Bank tortiously interfered with his contractual relationship with Bibeau. First Amended Complaint, Count 2, § 67. Unlike plaintiffs' claims of breach of contract and violation of the UTSA, these claims of tortious interference, as well as plaintiffs' conspiracy claims that follow, are intentional tort claims that depend on evidence that First Bank did not simply make a bad loan to CSI or even a negligent one, but that it made that loan purposely to interfere with plaintiffs' contracts with others and to harm plaintiffs unjustifiably. Plaintiffs seek to recover the profits that they claim they lost as a result of First Bank's consideration and ultimate granting of the loan to CSI.
"To establish a prima facie case of tortious interference with contractual relations," the Rhode Island Supreme Court has held that "the aggrieved party must show `(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [or her] intentional interference [with that contract]; and (4) damages resulting therefrom.'" Belliveau Bldg. Corp. v. William O'Coin, Jr., 763 A.2d 622, 627 (R.I. 2000) (quoting Smith Dev. Corp. v. Bilow Enter., Inc.,308 A.2d 477, 482 (1973)). The aggrieved party must prove legal malice, which is "intent to do harm without justification." Id.
In moving for summary judgment with respect to all of the plaintiffs' tortious interference claims, the defendant first argues that these claims are barred because plaintiffs cannot prove causation or damages. The defendant claims that Read Lundy lowered its prices six months before First Bank granted a loan to CSI; thus, any damages suffered by the plaintiffs from Read Lundy lowering its prices were the result of competition from other vendors and not the result of First Bank's loan to CSI.
The plaintiffs counter that most of the lost profits accrued after First Bank made the loan to CSI and that the loan to CSI perpetuated CSI's existence that, in turn, caused further damage to Read 
Lundy. At the same time, the plaintiffs argue that the mere fact that its customers knew that CSI had applied for a loan gave CSI credibility in the eyes of those customers.
According to the defendant, however, the plaintiffs have admitted that once Read Lundy lowered its prices to compete with CSI, Read 
Lundy was thereafter precluded from raising those prices back to their previous levels. The defendant refers to McFarland's testimony to bolster its argument:
 Q. Can you raise prices to these customers, Mr. McFarland?
 A. It would be very difficult.
 Q. Can you explain why?
 A. Once you've lowered pricing, it's very difficult to bring it up above the lowered price.
 Q. Can you explain why?
 A. Because the customer won't allow it.
 Q. What's the alternative?
 A. Oh, the alternative would be for them to go elsewhere and we may lose the customer completely.
Reply Brief of Appellants Cliff McFarland and Read Lundy, Inc., CA No. 99-374A at 18 (R.I. Supreme Ct.) (filed Dec. 14, 2000) (Defendant's Exhibit 39). The defendant also cites statements made by McFarland in his deposition:
 Q. Has Read Lundy tried to raise its prices within the last year?
 A. I continuously bring that up but it's not a possibility. It's like walking on egg shells.
 Q. Well, with what customers have you brought up raising prices in the last year?
 A. TPI
 . . . . . Q. What has been the substance of your conversation with [TPI] about prices?
 A. I don't recall the exact conversation but the answer has been no
 . . . . . Q. What other customers besides TPI have you discussed a price increase with?
 A. Well, I don't get out and talk to most of these customers now so I couldn't answer that question. I have been talking with my people about, you know, raising prices, but it falls on deaf ears. Under the circumstances a difficult, difficult situation. Once you lower prices, you're done.
Deposition of Cliff McFarland at 41 1.18 — 43 1.11 (July 30, 2002) (Defendant's Exhibit 9). Based on these statements, the defendant argues that the plaintiffs are collaterally estopped from arguing here that if First Bank had not granted CSI the loan, then Read Lundy could have raised its prices.
In addition, the defendant avers that the plaintiffs have admitted that CSI was not the only competitor for their customers. The defendant again points to statements made by the plaintiffs to argue its point:
 The assumption that in the absence of CSI Read Lundy was `the only game in town' is flatly contradicted by our customers' testimony; in [our customers'] words, `we could buy it from a hundred different places.'
Opening Brief of Appellants Cliff McFarland and Read Lundy, Inc., CA No. 99-374A at 12 (R.I. Supreme Ct.) (filed June 26, 2000) (Defendant's Exhibit 2). The defendant argues that this statement demonstrates that it was not the loan to CSI that caused the plaintiffs to lose profits, but the emergence of CSI as a competitor and the existence of other competitors.
To try to establish that it mattered to Read Lundy's customers whether CSI had financing, plaintiffs cite to the testimony of a customer, Mr. Nencka, where he stated that in October 1995 he was shown a "statement saying [CSI] was funded. I didn't memorize the dollar figure. I didn't memorize the bank. It looked official to me. And whatever dollars were on there seemed substantial enough for me to believe them." Testimony of Walter Nencka, C.A. No. 95-512-L (D.R.I. filed Aug. 7, 1996) (Plaintiffs' Exhibit 8). The testimony continued, and when asked whether the document had CSI's name on it, Nencka stated "I don't know. I honestly don't remember that." Id. The defendant argues that this testimony is not competent evidence because the letter has never surfaced and the defendant denies sending CSI a document, during the preliminary stages of the loan application process, stating that CSI was funded for half a million dollars.
As to their claims for damages caused by First Bank's alleged acts of tortious interference with contract, plaintiffs have failed to articulate what, if any, damages flowed to them from each alleged act of interference. Rather, the plaintiffs seek to recover profits lost from the across-the-board price decreases granted to its major customers in the fall of 1995. Plaintiff Read Lundy lowered its prices in the fall of 1995 to combat the threat posed by CSI and other competitors. As elucidated by the defendant's arguments above, McFarland has stated on more than one occasion that once prices were lowered, Read Lundy was precluded from thereafter raising them back to their previous levels. First Bank granted a loan to CSI more than six months after Read Lundy lowered its prices. Thus, First Bank's grant of a loan to CSI could not have been the legal cause of the plaintiffs' lost profits.
This Court thus agrees with the defendant that the plaintiffs cannot prove causation or damages. The Rhode Island Supreme Court has determined that "[c]ausation is proved by inference; thus when reasonable minds could infer that causation exists, the question must be submitted to the jury . . . . Proof by inference need not exclude every other possible cause, but it must be based on reasonable inferences drawn from the facts in evidence." Cartier v. State, 420 A.2d 843, 848 (1980). Here, the plaintiffs argue that a jury should be allowed to infer that making the loan to CSI was McCormick's way of "scraping the egg off his face." The inference that a jury would need to make, however, is that despite the fact that the plaintiffs lowered their prices six months before the defendant made the loan to CSI, and despite the plaintiffs' own testimony stating that once prices were lowered, they could not be raised, the plaintiffs' lost profits were caused by First Bank's loan to CSI. Viewing the facts presented to this Court by plaintiffs in a light most favorable to them, no reasonable jury could infer such a causal connection between the loan and the plaintiffs' claimed lost profits.
Moreover, plaintiffs have failed to adduce sufficient evidence to establish that any of Read Lundy's customers knew of CSI's loan application with First Bank in the fall of 1995 or that there was any known loan commitment. Mr. Nencka's testimony is entirely too speculative in this regard. Based on these evidentiary deficiencies in the record, no reasonable jury could infer that First Bank's mere consideration of CSI's loan application caused Read Lundy to lower its prices in October 1995 or suffer lost profits thereafter.
As a result, all of plaintiffs' claims of tortious interference with contractual relations must fail, as a matter of law, for want of sufficient facts to prove that these alleged tortious acts proximately caused plaintiffs to sustain their claimed compensatory damages. On this basis alone, this Court finds that the defendant's motion for summary judgment should be granted as to plaintiffs' claims of tortious interference with contractual relations.[12]
Even assuming, arguendo, that this Court could not dispose of plaintiffs' claims for tortious interference with contractual relations as a matter of law based on plaintiffs' inability to prove causation and damages, those claims would fail, as a matter of law, based on the lack of proof of contracts of which First Bank had knowledge and/or the absence of sufficient evidence to prove that First Bank intentionally interfered with any such contracts. The plaintiffs claim, for example, that First Bank interfered with Read Lundy's contractual relationships with Brier, Bibeau and its customers. Yet plaintiffs fail to present any evidence to show the existence of contracts between Read Lundy and Bibeau, Read Lundy and Brier and Read Lundy and its customers. Neither Bibeau nor Brier was working for Read 
Lundy when CSI was formed. Plaintiff Read Lundy has failed to elucidate what, if any, contracts existed between Brier and it or Bibeau and it after both men had left the company. The noncompetition agreement at issue in plaintiffs' complaint was not between Read Lundy and Bibeau but between McFarland and Bibeau. As to plaintiffs' claim that First Bank tortiously interfered with Read Lundy's contracts with its customers, plaintiffs have not only failed to produce evidence of such contracts, but they do not even identify the specific customer relationships with whom First Bank allegedly interfered.
In addition, the plaintiffs have failed to advance any evidence to demonstrate that First Bank had knowledge of any such alleged contracts between Ready Lundy and Bibeau, Read Lundy and Brier and Read Lundy and its customers. Plaintiffs' claims that First Bank tortiously interfered with Read Lundy's contracts with Bibeau, Brier and its customers must fail, therefore, because there is insufficient evidence to prove the existence of specific contracts with which First Bank allegedly interfered nor is there sufficient evidence of First Bank's knowledge of any such alleged contracts. To survive summary judgment, a nonmoving party cannot merely rely on its pleadings, but rather it must adduce facts by affidavit or otherwise showing the existence of a disputed material issue of fact. Super. Ct. R.Civ.P. 56(c).
In contrast, plaintiff McFarland has pled facts sufficient to show that a noncompetition agreement existed between Bibeau and him and that First Bank was aware of its existence. Yet the problem with his claim, as well as with all of the other claims by plaintiffs for tortious interference with contractual relations, is that the plaintiffs have failed (in addition to the problems of proof previously noted by this Court regarding the existence of certain contracts, First Bank's knowledge of those contracts, causation and damages) to present sufficient evidence of intentional interference by First Bank with any of the alleged contracts at issue. This failure of proof regarding intent is fatal to all of plaintiffs' claims of tortious interference with contract.
Plaintiff McFarland fails to elucidate precisely what act or acts on the part of First Bank constituted intentional interference with his contract with Bibeau. At most, First Bank considered granting a loan to the company where Bibeau was employed. The mere consideration of a loan application does not constitute interference with contract. Moreover, by the time First Bank granted CSI the loan, not only had First Bank placed noncompetition covenants in the loan that prohibited CSI from soliciting Read Lundy's customers, but CSI also was barred by court order from soliciting Read Lundy's customers. Plaintiff McFarland's averment that McCormick considered granting a loan to CSI as a means of "scraping the egg off his face" is speculative. It alleges a fact that, when considered together with all of the evidence, cannot prove legal malice. Thus, plaintiff McFarland has failed to show that there is any genuine issue of material fact as to First Bank's intentional interference with his noncompetition agreement with Bibeau. The evidence adduced by plaintiff McFarland in support of his tortious interference claim is simply insufficient, as a matter of law, to prove that First Bank made the loan to CSI with actual malice or the intent to interfere with McFarland's noncompetition agreement with Bibeau and to harm the plaintiff without legal justification.
Plaintiff Read Lundy has similar difficulty when it comes to proving the element of intent. Plaintiff Read Lundy merely states that CSI solicited its customers and that First Bank was aware of this fact while it considered granting a loan to CSI. By considering CSI's loan application, plaintiff Read Lundy asserts that CSI's credibility was bolstered in the eyes of Read Lundy's customers. To support its assertion, plaintiff Read Lundy offers the testimony of Mr. Nencka, who stated that his company would only switch providers if the prospective company had adequate financing on which to rely. As the defendant argues, however, Nencka's testimony does nothing to assist the plaintiffs. Nencka testified that he was shown a letter by Brier in October 1995 that essentially stated that someone promised to loan someone a substantial amount of money, but he could not state the name of either party involved in the transaction. This letter has not surfaced and the defendant has denied sending such a letter to CSI. Plaintiff Read Lundy has offered no evidence that First Bank discussed CSI's loan application with any of its customers nor has it offered any evidence showing that any of its customers abandoned it because First Bank was considering CSI's loan application.
There likewise is no evidence in the record submitted by plaintiffs to suggest that First Bank's making of the loan to CSI actually interfered with any of Read Lundy's contractual relations with its customers. Most importantly, there is inadequate evidence, even when viewed in a light most favorable to plaintiff, to prove that, in making the loan, First Bank was motivated by actual malice and intended to interfere with these customer relations and cause Read Lundy harm.
For all of these reasons, the defendant's motion for summary judgment is granted as to all of the plaintiffs' claims of tortious interference with contract.
 Plaintiffs' Claims of Civil Conspiracy
In their first amended complaint, the plaintiffs allege that First Bank participated in and joined the unlawful enterprise of CSI, Brier, Brier Company, Inc. and Bibeau with the intention that it would profit from their efforts and their use of Read Lundy's confidential information and trade secrets. First Amended Complaint, Count 3, §§ 68-69. The plaintiffs claim that the unlawful objects of the conspiracy included violation of the UTSA, violation of Brier's professional obligation not to disclose or misuse information learned while he was Read Lundy's accountant, violation of Bibeau's contractual obligation not to solicit Read Lundy's customers, and violation by all participants in the conspiracy, including First Bank, of their obligations not to interfere with Read Lundy's contractual relationships with its customers. Id. § 70. Plaintiffs seek to hold the defendant liable for all of their damages caused by the acts of all participants in the conspiracy. Id. § 71.
The defendant has moved for summary judgment as to plaintiffs' claims for civil conspiracy on the grounds that plaintiffs cannot prove, as a matter of law, that First Bank made the loan to CSI as part of an unlawful enterprise with the specific intent to engage in illegal or tortious conduct or to further the illegal purposes of others. The defendant argues that First Bank's dealings with CSI were for a lawful and legitimate purpose — namely, the granting of a loan to a legal entity that, although involved in litigation with the plaintiffs, was allowed to compete in the same industry with the plaintiffs — and that plaintiffs cannot prove otherwise.
The plaintiffs, on the other hand, point to events that they claim signal conspiracy: that First Bank knew that CSI, Brier, and Bibeau were entangled in litigation with the plaintiffs; that First Bank ignored the covenants on the loan to CSI; that First Bank cooperated with Brier's efforts to conceal Bibeau's role at CSI from the Court; that the defendant downplayed the significance of the CSI litigation to the SBA; that First Bank colluded with Brier to apply his certificate of deposit against CSI's outstanding loan balance; and that First Bank's agent, McCormick, was bitter toward McFarland for the failure of the Read 
Lundy loan.
Though rarely pleaded, civil conspiracy is a valid cause of action in Rhode Island. See Stubbs v. Taft, 88 R.I. 462, 149 A.2d 706 (1959). InStubbs, the Rhode Island Supreme Court stated that:
 In order to establish a conspiracy, evidence must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. Disconnected circumstances, any one of which or all of which are just as consistent with a lawful purpose as with an unlawful undertaking, are insufficient to establish a conspiracy. However, the doctrine of reasonable doubt has no place in a civil suit for damages where it is sufficient if the evidence is full, clear and satisfactory, and the conspiracy established by a preponderance of the evidence. This degree of proof, however, is necessary. The evidence must do more than raise a suspicion. It must lead to belief.
Id. at 468, 149 A.2d at 708-09 (quoting 12 C.J.S. Conspiracy § 234 at 69). Conspiracy is "a combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose." Statev. Mastracchio, 612 A.2d 698, 706 (R.I. 1992). A civil conspiracy fails without evidence "to show the requisite unlawful purpose or unlawful means." Sullivan v. Faria, 112 R.I. 132, 138, 308 A.2d 473, 477 (1973). "A civil conspiracy claim requires the specific intent to do something illegal or tortious." Guilbeault v. R.J. Reynolds Tobacco Co.,84 F. Supp.2d 263, 268 (D.R.I. 2000). "Because the complete and detailed particulars of a conspiracy are not always capable of proof, `the goals of the conspirators may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties.'" Statev. Smith, 662 A.2d 1171, 1177 (R.I. 1977) (quoting State v. Gordon,508 A.2d 1339, 1349 (R.I. 1986)).
"Civil conspiracy is not an independent basis of liability, but merely a means of establishing joint liability for tortious conduct. Thus, a civil conspiracy claim requires a valid underlying intentional tort theory." Guilbeault, 84 F. Supp.2d at 268. "[The plaintiff] must allege all the elements of a cause of action for the tort the same as would be required if there were no allegation of a conspiracy." Beck v. Prupis,529 U.S. 494, 501-02 (2000) (quoting J. C. Ornamental Iron Co. v.Watkins, 152 S.E.2d 613, 615 (Ga. 1966)). "The mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution." Id. at 501 (quoting W. Prosser, Law of Torts § 46, p. 293 (4th ed. 1971)). Under the common law of civil conspiracy, a plaintiff only can bring suit "if he ha[s] been injured by an act that was itself tortious." Id. Moreover, "there must be consequent damage." Id. at 502 (quoting Adler v. Fenton, 65 U.S. 407, 410 (1861)).
In the case at bar, plaintiffs have attempted to paint a picture of an overarching conspiracy among First Bank, CSI, Brier and Bibeau using broad strokes of the brush. It is not evident from all of the plaintiffs' voluminous submissions to this Court in opposition to defendant's motion for summary judgment whether they base their conspiracy claims against the defendant on allegations that First Bank engaged in unlawful acts with the other alleged conspirators, on allegations that First Bank engaged in a lawful act for unlawful purposes or on both categories of alleged conspiratorial conduct. Plaintiffs fail to define with any precision the nature of the unlawful acts or lawful acts with unlawful purposes that form the bases of their conspiracy claims. These failures are illustrative of the tenuous ground on which plaintiffs' conspiracy claims rest.
The facts in this case, even when viewed in a light most favorable to the plaintiffs, are insufficient, as a matter of law, to prove the defendant liable for civil conspiracy. The evidence adduced by plaintiffs simply falls woefully short of establishing that First Bank made the loan to CSI with the specific intent to do something illegal or tortious or to further the illegal or tortious conduct of others in collusion with CSI, Bibeau and Brier.
To bring a valid conspiracy claim, the underlying tort must be actionable itself. See Deutsche Fin. Serv. Corp. v. BSC Ins. Co.,299 F.3d 692, 700 (8th Cir. 2002) (stating that the plaintiff "cannot prevail on its claim for civil conspiracy where the underlying tort claim fails"); Royal Bank Export Fin. Co. v. Sheller, C.A. No. 93-1544, 1994 U.S. App. LEXIS 34602 (4th Cir. Md. filed Dec. 12, 1994) (stating that "acts alleged in furtherance of the conspiracy must be actionable when the conspiracy claim is brought"). By extension, the underlying tort claim cannot be barred by the applicable statute of limitation. SeeKaufmann v. Sheehan, 707 F.2d 355, 357 (8th Cir. 1983) (holding that the statute of limitation for bringing an action for conspiracy to defame is the same as the statute of limitation for the underlying tort of defamation because "to permit the plaintiff to circumvent the applicable statute of limitations for defamation by the simple procedure of alleging a conspiracy to defame would defeat the purpose of the statute of limitations imposed by the legislature").
To the extent, therefore, that plaintiffs base their conspiracy claims against the defendant on their other stated claims against the defendant for (1) violation of the UTSA, (2) tortious interference with Read 
Lundy's contractual relations with its customers and (3) tortious interference with McFarland's noncompetition agreement with Bibeau, those conspiracy claims must fail for want of an actionable underlying tort. As previously decided by this Court, none of these other claims in plaintiffs' first amended complaint can withstand summary judgment. In addition, there is insufficient evidence of an agreement by First Bank with CSI, Bibeau and Brier to accomplish these allegedly unlawful objects. The record, therefore, is inadequate to allow a fact finder to conclude that First Bank made the loan to CSI as part of the alleged enterprise with the specific intent that it be illegal or tortious.
To the extent plaintiffs base their conspiracy claims against the defendant instead on either (1) an allegation that First Bank conspired with CSI, Bibeau and Brier to have these other alleged conspirators commit the unlawful acts of violation of the UTSA, violation of Brier's professional duties and tortious interference with plaintiffs' contracts or (2) an allegation that First Bank made the loan lawfully for the purpose of furthering these unlawful acts of the other alleged conspirators, plaintiffs' conspiracy claims still must fail for lack of evidence of an agreement to do something illegal or tortious. There is no evidence that First Bank was a party to the unlawful actions of CSI, Bibeau and Brier to use trade secret information of Read Lundy, in violation of Brier's professional obligations to Read Lundy and Bibeau's noncompetition agreement with McFarland, or to wrongfully solicit Read Lundy's customers and wrongfully compete with the company with whom they previously had been affiliated. Indeed, First Bank did not make the loan to CSI until more than six months after these wrongful actions were initiated by the other actors and months after these actors were enjoined by the courts from engaging in such conduct. Any attempt by the plaintiffs to suggest that First Bank was part of this unlawful enterprise before making the loan is not supported by the evidence or arguments and would be entirely speculative.
Moreover, it is the making of the loan by First Bank that is at the heart of plaintiffs' conspiracy claims against the defendant. To the extent plaintiffs suggest that the loan was lawfully made for an unlawful purpose (namely to further the unlawful enterprise of CSI, Bibeau and Brier and to profit from their tortious and unlawful conduct), there also are insufficient facts to support this theory. At the time First Bank made the loan, CSI, Brier and Bibeau had been enjoined by the courts from continuing their unlawful enterprise. First Bank put language into the loan documents to control the purposes for which CSI used the loan proceeds, to prohibit CSI from competing unlawfully with Read Lundy and to try to ensure sufficient collateral for the loan. First Bank's outside counsel and the Small Business Administration reviewed the loan documents in light of the pending litigation involving plaintiffs, CSI, Bibeau and Brier.
This evidence strongly suggests that First Bank, in granting the loan, acted with a lawful and justifiable purpose — namely to make a commercial loan to a borrower that, although entangled in a dispute with plaintiffs, could compete lawfully in the industrial supply business. Indeed, Judge Lagueux indicated in the related federal court litigation, prior to First Bank making the subject loan, that while Bibeau was enjoined from competing for Read Lundy customers, he could continue to work for CSI as long as he did not sell the same product to the same customers to whom Read Lundy sold that product as of September 20, 1995. Tr. of Aug. 15, 1996 Hearing at 26 (Defendant's Exhibit 7). And even McFarland, in his deposition, characterized the loan, at worst, as "foolish," but not improper. Deposition of Cliff McFarland at 131-32 (July 30, 2002) (Defendant's Exhibit 9).
If plaintiffs truly thought that First Bank had made the loan to CSI either unlawfully or lawfully to further the illegal purposes of the other alleged conspirators, then surely they would have communicated those concerns to First Bank, sought to enjoin disbursement of the loan proceeds and/or named First Bank as an alleged co-conspirator with CSI, Bibeau and Brier in the prior McFarland cases. Yet plaintiffs did none of those things. Id. at 101-02, 131-32, and 155.
Furthermore, the facts on which plaintiffs rely to show a conspiracy are all consistent with First Bank's interest in making a lawful commercial loan from which it thought it could profit and taking those steps that it deemed necessary to protect its interest in securing repayment of the loan thereafter. Evidence that is equally consistent with a lawful purpose as with an unlawful one is simply insufficient to establish a claim of civil conspiracy. Stubbs, 149 A.2d at 708-09.
Plaintiffs' claims of civil conspiracy against the defendant thus fail as a matter of law. The plaintiffs simply have failed to offer the "full, clear and satisfactory" facts that are necessary for them to prove, by a preponderance of the evidence, that First Bank had the specific intent in making the loan to CSI to prosecute or aid in the prosecution of an unlawful enterprise to harm the plaintiffs. The evidence that First Bank made the loan for a lawful and justifiable purpose, devoid of such ulterior motive, thwarts the plaintiffs' ability to satisfy their burden of proof in this regard. Defendant's motion for summary judgment with respect to plaintiffs' civil conspiracy claims, therefore, is granted.
 CONCLUSION
After viewing the facts and all reasonable inferences therefrom as to all of the plaintiffs' claims in a light most favorable to the plaintiffs, this Court grants the defendant's motion for summary judgment in its entirety. All counsel of record are directed to confer and to submit to this Court forthwith for entry an order and judgment that are in conformity with this decision.
[1] There are several paragraphs contained in the Statement of Undisputed Facts with which plaintiffs apparently take issue. See, e.g.,
§§ 5, 13, and 29. As this Court is required to view the evidence in a light most favorable to plaintiffs with respect to defendant's summary judgment motion, it is the plaintiffs' version of the facts stated in any disputed paragraphs of the Statement that this Court has accepted as true for purposes of this motion.
[2] In February 1996, the United States District Court for the District of Rhode Island issued a preliminary injunction barring Bibeau from soliciting two of Read Lundy's customers.
[3] The plaintiffs ultimately prevailed in the case and were awarded substantial damages. Yet they have not been able to collect any of this award. See Plaintiffs' First Amended Complaint, § 62 (Dec. 21, 2001). The defendant suggests that the instant action filed by plaintiffs against it is driven by their inability to collect the judgment rendered against the true wrongdoers.
[4] Pre-trial discovery in this case is ongoing, but no party has suggested that the defendant's motion for summary judgment is not ripe for decision based on the record submitted.
[5] At the outset, the Court notes that the existence of UTSA does not prevent the plaintiffs from seeking "[c]ontractual remedies, whether or not based on misappropriation of a trade secret." R.I. Gen. Laws §6-41-7(b)(1) (1956). Thus, the plaintiffs may bring a contract claim against the defendant, as long as it is actionable. The statute of limitations for contract claims is generally ten years from the accrual of the cause of action. R.I. Gen. Laws § 9-1-13 (1956).
[6] The plaintiff cites the following cases: O'Coin v. WoonsocketInst. Trust Co., 535 A.2d 1263 (R.I. 1988) (discussing, but not deciding, whether banks have an implied contractual duty not to disclose personal information); Peterson v. Idaho First Nat'l Bank, 367 P.2d 284
(Idaho 1961) (holding that banks have an implied contractual duty of confidentiality as to their customer's personal information; here the bank made a disclosure to a third party).
There are other relevant cases concerning the duty of confidentiality imposed upon banks. See Djowharzadeh v. City Nat'l Bank Trust Co.,646 P.2d 616 (Okla.Ct.App. 1982) (holding that banks owe individual customers an implied duty of confidentiality; here the bank made a disclosure to third parties) ; Suburban Trust Co. v. Waller, 408 A.2d 758, 762 (Md.Ct.Spec.App. 1979) (holding that banks implicitly warrant to maintain confidentiality over individual depositor's affairs to the extent permitted by law; here the bank made a disclosure to a third party); see also Barnett Bank of West Florida v. Hooper, 498 So.2d 923 (Fla. 1986); Indiana Nat'l Bank v. Chapman, 482 N.E.2d 474 (Ind.App. 1985); Suburban Trust Co. v. Waller, 408 A.2d 758 (1979); Graney Dev.Corp. v. Taksen, 92 Misc.2d 764 (App.Div. 1978); Richfield Bank Trust Co. v. Sjogren, 244 N.W.2d 648 (1976).
[7] Interestingly enough, as noted by the defendant in this case, federal law does not prohibit banks from using internally the commercial loan information of borrowers in their consideration, and granting, of competing customers' commercial loan requests. Indeed, under the Gramm-Leach Bliley Act ("the Act"), 15 U.S.C. § 6801 et seq.,
financial institutions are required to have measures in place to secure the nonpublic, personal information of consumers. A "consumer" is defined under the Act as "an individual who obtains, from a financial institution, financial products or services which are to be used primarily for personal, family, or household purposes, and also means the legal representative of such an individual." Id. § 6809(9). There is no corresponding provision in federal law requiring banks to protect the confidential information of commercial borrowers or restricting banks from using such information internally. Indeed, the Act only proscribes the nonconsentual disclosure of nonpublic, personal information of consumers to a "nonaffiliated third party." Id. § 6802(1). In this regard, federal law comports with the common law and suggests that the common law should not be expanded to impose a legal duty on banks that is not reflected in the federal banking law.
[8] These cases deal with misappropriation based on disclosure rather than use; however, they emphasize the complete agreement among courts interpreting the UTSA that the discovery rule is broad and does not forgive parties who do not act when the facts before them demand such action.
[9] Mr. Hague served as outside loan counsel to First Bank and acted as counsel to McCormick at his deposition.
[10] RMA refers to Robert Morris Association — an institution that compiles statistics for lenders.
[11] See Plaintiffs' Objection to Summary Judgment at 26 (wherein plaintiffs acknowledge that Mr. McCormick announced "in March of 1996 that First Bank was considering making a loan to CSI and [that it] had used Read Lundy's information in its analysis of whether to do so").
[12] The absence of sufficient evidence to prove causation and damages also is fatal to plaintiffs' claims for compensatory damages for breach of contract and violation of the UTSA.
In addition to compensatory damages, the plaintiffs seek attorneys' fees that they have incurred in connection with this litigation as well as with their past litigation involving CSI, Brier, and Bibeau. The plaintiffs assert that they may recover such fees pursuant to R.I. Gen. Laws § 6-41-4(c) (1956) for First Bank's alleged violation of the UTSA and pursuant to R.I. Gen. Laws § 9-1-45 (1956) in connection with their breach of contract claims. Plaintiffs make no claim for attorneys' fees in conjunction with their claims of tortious interference with contractual relations. This Court, however, has granted the defendant's motion for summary judgment as to plaintiffs' UTSA claims and their breach of contract claims. As such, plaintiffs are precluded from recovering attorneys' fees in connection with those claims.