SUBURBAN TRUST COMPANY *v.* MAURICE WALLER

[No. 274, September Term, 1979.]

*Decided December 7, 1979.*

The cause was argued before GILBERT, C. J., and MELVIN and WEANT, JJ.

*Francis J. Ford* for appellant.

*David J. Frantz,* with whom were *David B. Lamb* and *Lamb, Halleck & Keats* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

Street and Smith [1] would have probably entitled this case as, "The Bank That Talked Too Much." The matter presents us with a novel question of the existence and scope of a bank's duty of confidentiality concerning the affairs of its depositors.[2]

The appellee, Maurice Waller (Waller) deposited $800 in his account at the Suburban Trust Company (Bank). Because of the actions of a security official, Waller was arrested on a charge of robbery with a dangerous and deadly weapon. The facts surrounding the deposit led a jury in the Circuit Court

---

**1.** Former publishers of so-called "pulp magazines." "Pulps," descendants of dime novels, originated in 1896 when Frank Munsey changed his *Argosy* to an all fiction magazine and printed it on a rough wood pulp paper to save money. The subjects of the publications fell into four main categories: adventure, love, detective, and western stories. Street and Smith were successful publishers of pulps, pioneering the latter three categories with *Love Story, Detective Story,* and *Western Story.* In the middle of the 1940's, however, rising production costs caused Street and Smith to abandon pulps as unprofitable. Peterson, *Magazines in the Twentieth Century* 283-86 (1958).

**2.** "Banks," Jim Oigan used to say, "are like people. Some are big, some are small; some are secretive; others tell all." *See* Anderson v. Associated Professors of Loyola College, 39 Md. App. 345, 346, 385 A.2d 1203, 1203, *cert. denied,* 283 Md. 729 (1978).

for Montgomery County to withdraw, in the form of a verdict in favor of Waller, $50,000 from the Bank's coffers and transfer it to Waller's treasury. Understandably upset by the judgment entered on the jury's verdict, the Bank has appealed in an effort to divest itself of what it apparently sees as an unjust liability.

## THE FACTS.

Waller, in February 1976, opened an account at the Bank's Langley Park branch. About a month later, March 16, 1976, he attempted to have an income tax refund check cashed there, but that attempt was rebuffed because the balance in his account was insufficient to "cover" the check. He, along with Marvin Turner, a fellow employee of Waller who also wanted a check cashed, went to the United States Treasury Department in the District of Columbia. The checks were cashed, and Waller and his companion returned to the Bank, where Waller made a deposit of $800. Simultaneously, Turner deposited an identical amount in a new account. The money was in fifty and one hundred dollar bills, and the serial numbers printed thereon were sequential.

The employee [3] who handled Waller's deposit was a teller-trainee. Believing the transaction involving large sequentially numbered bills to be of an unusual nature, he called the matter to the attention of Mrs. Bane, who, together with her duties at her own teller station, was charged with supervising the trainees' work. Mrs. Bane, in turn, notified the assistant manager, James Jones, who contacted the security department. Jones spoke to William Brandt, an assistant security officer for the Bank. Brandt was asked if the serial numbers on the bills were on any of the "warning lists that the Bank receives periodically." The security officer told Jones that he would check out the matter. Pending information from Brandt, Assistant Manager Jones instructed Mrs. Bane to withhold the bills from circulation.

---

3. Unfortunately, as it turned out for the Bank, this was not the same teller who had handled Waller on his first visit to the Bank.

Brandt first contacted the Federal Bureau of Investigation in order to ascertain whether the serial numbers had appeared on that agency's "N.C.I. register." [4] The reply, we infer, was in the negative. Brandt, seemingly unsatisfied with stopping at that point, began to call the local law enforcement agencies. When he contacted the Montgomery County Police Department, he spoke to Corporal Howell. The police officer testified [5] that Brandt asked him if there had been any large cash robberies recently. Howell replied that in a recent "residential robbery" $3,000 in fifty and one hundred dollar bills had been taken. He then read the descriptions of the suspects to Brandt, who replied that they were "similar to two individuals who had come in the Suburban Trust Bank, the branch at Langley Park." Brandt then disclosed to Howell Waller's name, address, description, and employment, as well as the information concerning his deposit of that morning. Subsequently, the Bank's surveillance photographs were also made available to the police. [6]

Howell turned over the information that had been furnished by Brandt to Detective Ingels, who was the person who obtained Waller's photographs from Brandt. The pictures were shown to the victim of the residential robbery, one Brody, who tentatively identified Waller as one of the perpetrators of the crime. The police then acquired a different photograph from Waller's employer. Brody then positively identified Waller as one of the robbers. Waller was arrested and criminally processed. Ultimately, the victim retracted the identification, and the charges against Waller were dropped.

He then filed suit alleging that the bank had (1) invaded his privacy and (2) breached an implied condition of their contract, *i.e.,* the obligation of confidentiality. [7] The case

4. "N.C.I.," we infer, is a computer print-out of the known serial numbers of stolen bills, maintained by the National Crime Information Center.

5. Brandt testified that he remembered little or nothing of his conversation with Corporal Howell. As a result, the testimony of the officer on what transpired was uncontradicted.

6. This was the last contact, until this suit, that the Bank had with the matter.

7. Waller's original declaration alleged only an invasion of privacy, but was later amended to add the *ex contractu* claim.

proceeded to trial, where, at the close of Waller's evidence, the trial judge directed a verdict against him on the count for invasion of privacy and on the matter of punitive damages.[8] Following the presentation of the Bank's defense, the court directed a verdict in favor of Waller on the issue of liability, leaving the assessment of damages to the jury.

Attempting to cancel the "withdrawal" made by the jury, the appellant impugns the judgment on three grounds:

> I. The trial court erred in failing to rule as a matter of law that the Bank's limited disclosure to the police was reasonable.
>
> II. The trial court erred in failing to rule as a matter of law that the Bank's actions were not the proximate cause of Waller's alleged damages.
>
> III. The trial court erred in instructing the jury that it could award damages for loss of reputation where there was no adequate evidence presented on the issue.

## THE LAW.

### I.

At common law, the relationship of a bank to its customer was not considered to be fiduciary in nature, but rather as that of a debtor and his creditor, *Foley v. Hill,* 2 H.L. Cas. 28 (1848); *Watts v. Christie,* 11 Beav. 546 (1849); 1 Morse, *A Treatise on the Law of Banks and Banking* § 289 (6th ed. 1928), "the rights of the depositor and the liability of the bank being contractual." [9] *Taylor v. Equitable Trust Co.,* 269 Md. 149, 155, 304 A.2d 838, 842 (1973). The appellate decisions of this State have consistently followed that view. *See*

---

8. Waller did not cross-appeal, and we, therefore, express no opinion as to the propriety of the trial judge's rulings with respect to the directed verdicts on invasion of privacy and punitive damages.

9. "[T]he money deposited in ... [the bank] is regarded as a loan to the bank by the depositor, with the right of the depositor to draw on it to the extent of the deposit." Keller v. Frederickstown Sav. Inst., 193 Md. 292, 296, 66 A.2d 924, 925 (1949).

*University National Bank v. Wolfe,* 279 Md. 512, 514, 369 A.2d 570, 571 (1977); *Keller v. Frederickstown Savings Institution, supra,* 193 Md. at 296, 66 A.2d at 925-26; *Pritchard v. Myers,* 174 Md. 66, 76, 197 A. 620, 625 (1938); *Hardy v. Chesapeake Bank,* 51 Md. 562, 585, 34 A.R. 325, 328 (1879); *Horwitz v. Ellinger,* 31 Md. 492, 503 (1869); 5 A. Michie, *Banks and Banking* § 1 (1973).[10]

Modern society virtually demands that one maintain a bank account of some sort. "In a sense a person is defined by the checks he writes. By examining them . . . [one] get[s] to know his doctors, lawyers, creditors, political allies, social connections, religious affiliation, educational interests, the papers and magazines he reads, and so on *ad infinitum.*" *California Bankers Association v. Shultz,* 416 U.S. 21, 85, 94 S.Ct. 1494, 1529, 39 L.Ed.2d 812, 854 (1974) (Douglas, J., dissenting). The message of Mr. Justice Douglas in *Shultz* is clear: If it is true that a man is known by the company he keeps, then his soul is almost laid bare to the examiner of his checking account. More recently, these revelations have been recorded and preserved under compulsion of law. *See* 12 U.S.C. § 1829(b); 31 C.F.R. 103.31-103.34 (1978). Patently, the vital information placed within the bank's control presents potential sources of use as well as abuse.[11]

Courts have recognized the special considerations inherent in the bank-depositor relationship and have not hesitated to find that a bank implicitly warrants to maintain, in strict confidence, information regarding its depositor's affairs.

---

**10.** *See also* Union Trust Co. v. Soble, 192 Md. 427, 430-31, 64 A.2d 744, 745 (1949); Magness v. Trust Co., 176 Md. 528, 531, 6 A.2d 241, 243 (1939); Terminals Co. v. Hospelhorn, 172 Md. 291, 298, 191 A. 707, 710 (1937); Dunlop Sand & Gravel Corp. v. Hospelhorn, 172 Md. 279, 287, 191 A. 701, 705 (1937); First Denton Nat. Bank v. Kenney, 116 Md. 24, 29-30, 81 A. 227, 229 (1911); Colton v. Drovers' Bldg. Assn., 90 Md. 85, 89, 45 A. 23, 24 (1899); *Note, Negotiable Instruments: Payment of Materially Altered Checks: Bank Not Liable to Depositor in Tort,* 40 Cornell L.Q. 795 (1955).

**11.** We observe that this potential for dissemination of the privileged information is increased where all employees of the bank are not *fully* informed as to bank policy on confidentiality. Brandt testified that he received no formal training in such matters, although he understood that "no account information" was to be disclosed. In the instant case, Brandt felt that the disclosure of account information was justified by the unusual nature of Waller's transaction. It appears to us that "bank policy" thus would be determined largely by Brandt's discretion as to what was or was not an unusual transaction.

The seminal case with respect to a bank's obligation of "strict confidence" appears to be *Tournier v. National Provincial and Union Bank of England,* 1 K.B. 461 (1923). In that case the plaintiff overdrew his account and after agreeing to make good the overdraft, failed to perform. The bank called Tournier's employer and in the course of the conversation, disclosed that "one cheque [coming through the bank payable to the plaintiff] . . . [had] gone to the credit of a bookmaker's account." As a result of the bank's garrulity, Tournier found himself without employment.

A three-judge panel of the English Court of Appeal held that the bank had breached its implied contractual duty of nondisclosure. Lord Justice Scrutton explained:

> "The contract is alleged in the claim as 'implied' and . . . implied terms are a question of law for the Court. . . . The Court will only imply terms which must necessarily have been in the contemplation of the parties in making the contract. Applying this principle to such knowledge of life as a judge is allowed to have, I have no doubt that it is an implied term of a banker's contract with his customer that the banker shall not disclose the account or, transactions relating thereto, of his customer. . . ."[12]
> *Id.* at 480.

The decisions of appellate courts in this country are generally in accord with *Tournier.* The Supreme Court of Idaho, in *Peterson v. Idaho First National Bank,* 83 Idaho 578, 588, 367 P.2d 284, 290 (1961), opined:

> "It is inconceivable that a bank would at any time consider itself at liberty to disclose the intimate details of its depositors' accounts. Inviolate secrecy is one of the inherent and fundamental precepts of the relationship of the bank and its customers or depositors. This high ethical standard is recognized

---

12. Although Lord Justice Scrutton would have limited the duty to information concerning "the account or transactions relating thereto," the remaining justices would have extended it to all information acquired by the banker during the currency of the account and in his character as the banker.

by the defendant bank in the instant case, as outlined in the manager's deposition.

It is implicit in the contract of the bank with its customer or depositor that no information may be disclosed by the bank or its employees concerning the customer's or depositor's account. . . ."

5 A, Michie, *Banks and Banking* § 1 (1973) states, "Bank depositors have the right of secrecy and a bank is under an implied obligation to keep secret its records of accounts, deposits and withdrawals." *See also Burrows v. Superior Court of San Bernardino County,* 13 Cal. 3rd 238, 118 Cal. Rptr. 166, 529 P.2d 590 (1974); *Milohnich v. First National Bank of Miami Springs,* 224 So.2d 759 (Fla. Dist. Ct. App. 1969); *Richfield Bank and Trust Co. v. Sjogren,* 309 Minn. 362, 244 N.W.2d 648 (1976); *Brex v. Smith,* 104 N.J.Eq. 386, 146 A. 34 (1929); 5 Zollman, *Banks and Banking* § 3413 (Per. Ed., 1943); 10 Am. Jur. 2d *Banks* § 332 (1963).

The appellant readily concedes that it was under such a duty, but attempts to execute a "Green Bay sweep" [13] around its obligation. Specifically, the Bank avers that the duty imposed upon it by the contract is qualified in nature. The Bank posits that it was required only "under reasonable circumstances" not to disclose "unnecessarily, promiscuously, or maliciously . . . such information," and that "as a matter of law it acted reasonably under the circumstances." We have an entirely different view.

Although the courts, without exception, have implied a warranty of confidentiality they have diverged in their outlook as to the circumstances under which the bank is released from its obligation. Lord Justice Atkins, in *Tournier,* classified the qualification of the contractual duty of secrecy under four headings:

"(a) Where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure;

---

**13.** *See* Security Construction Co. v. Maietta, 25 Md. App. 303, 308, 334 A.2d 133, 136 (1975).

(d) where the disclosure is made by the express or implied consent of the customer." [14] 1 K.B. at 473.

The statement is made in 10 Am. Jur. 2d *Banks* § 332 (1963) that the bank is under a duty of nondisclosure "unless the banker is compelled to do so by court order, the circumstances give rise to a public duty of disclosure, or the protection of the banker's own interest require [disclosure]."

Notwithstanding what is written in 10 Am. Jur. 2d *Banks* § 332, the American cases generally are more restrictive with respect to the exceptions from the obligation of confidentiality. In *Brex v. Smith, supra,* 104 N.J. Eq. at 390, 146 A. at 36, the chancellor declared that "there is an implied obligation . . . to keep these [depositors' bank records] from scrutiny *until compelled by a court of competent jurisdiction to do otherwise."* (Emphasis supplied.)

The Idaho Court, in *Peterson,* stated that "no information may be disclosed . . . unless authorized by law or by the customer or depositor. . . ." 83 Idaho at 588, 367 P.2d at 290.

Justice Mosk, speaking for the California Supreme Court in *Burrows v. Superior Court of San Bernardino County, supra,* 113 Cal. 3rd at 243, 118 Cal. Rptr. at 169, 529 P.2d at 593, said that "[a] bank customer's reasonable expectation is that, *absent compulsion by legal process,* the matters he reveals to the bank will be utilized by the bank only for internal banking purposes." [15] (Emphasis supplied.)

We specifically reject both the *Tournier* fourfold classification of qualifications to the implied contractual obligation of confidentiality owed by a bank to its depositors and the 10 Am. Jur. 2d *Banks* § 332 grouping. We so do because we believe that those two authorities confer upon a bank entirely too much discretion. Were we to follow *Tournier* or 10 Am. Jur. 2d *Banks* § 332, we would permit a bank to

14. The remaining two justices reached the same conclusion as did Lord Justice Atkins.

15. While the California court took this position where the bank was a "neutral" party, Justice Mosk would have permitted the bank a broader latitude of disclosure where it was placed in an adversarial position *vis-a-vis* the depositor.

decide what is or is not in the public interest to disclose, and what is or is not in the best interest of the bank to disclose. That vast area of discretion, it seems to us, transmogrifies confidentiality to the point that it bears little, if any, resemblance to its original meaning. Moreover, *Tournier* and 10 Am. Jur. 2d, *Banks* § 332, appear to be a potential source of numerous law suits in order to establish the fixed perimeters of the bank's discretion.

The necessity of ascertaining the scope of the discretion that *Tournier* and 10 Am. Jur. 2d, *Banks* § 332 would vest in a bank is totally removed by the more rigid standards of *Brex, Peterson,* and *Burrows.* We are persuaded that *Brex, Peterson,* and *Burrows* have mapped the better route for us to travel.

We think that a bank depositor in this State has a right to expect that the bank will, to the extent permitted by law, treat as confidential, all information regarding his account and any transaction relating thereto. Accordingly, we hold that, absent compulsion by law, a bank may not make any disclosures concerning a depositor's account without the express or implied consent of the depositor.

Our conclusion is buttressed by the action taken by the General Assembly in enacting Laws 1976, ch. 252.[16]

Apparently disturbed by what it believed to be the trend, out of all scotch and notch,[17] among banks and other fiduciary institutions to furnish information without compulsion to governmental agencies, the Legislature in its preamble to Laws 1976, ch. 252 said:

> "(a) The General Assembly of Maryland finds and declares that:
>
> (1) procedures and policies governing the relationship between fiduciary institutions and

---

16. *See also* 12 U.S.C. § 3401 *et seq.* Laws 1976, ch. 252, was not effective until July 1, 1976, a period of approximately 120 days after the onset of the events in the instant case.

17. The expression comes from the child's game of hopscotch. It means "beyond all bounds" and refers to the boundary lines (scotches) and corners (notches) used in the game. Morris, *Dictionary of Word and Phrase Origins* 425 (1977).

government agencies have in some cases developed without due regard to the constitutional rights of customers of those institutions; and

(2) the confidential relationships between fiduciary institutions and their customers must be preserved and protected.

(b) It is the purpose of this Act to protect and preserve the confidential relationship between fiduciary institutions and their customers and to promote commerce by prescribing policies and procedures applicable to the disclosure of customer records by fiduciary institutions."

By the enactment of Laws 1976, ch. 252, the people of Maryland, through their duly elected representatives, made explicit what had theretofore been implicit — banks may not, absent legal compulsion or express or implied authorization from the depositor concerned, reveal any information to any one, including police and other government agencies, about the depositor's dealings with the bank. To underscore their deep concern over the right of a depositor in a bank to confidentiality as regards his dealings with the bank, chapter 252 mandates that "any officer or employee of a fiduciary institution ... who knowingly and willfully furnishes financial records in violation of this subtitle is guilty of a misdemeanor...." [18] Md. Ann. Code art. 11, § 227(a). A similar provision with specific reference to "[a]ny person who knowingly and willfully induces or attempts to induce" any bank officer or employee to violate art. 11, § 227(a) is found in section 227(b).[19]

The purpose of the Act having been made crystal clear, the Legislature then declared:

"A fiduciary institution may not disclose to any person, except to the customer or his duly authorized

---

**18.** Upon conviction of the offense, a maximum fine of $1,000 may be imposed. Md. Ann. Code art. 11, § 227(a).

**19.** The prescribed punishment is the same as that in n. 18, *supra.* Md. Ann. Code art. 11, § 227(b).

agent, any financial records relating to that customer of that fiduciary institution unless:

(a) The customer has authorized disclosure to the person; or

(b) The financial records are disclosed in response to a lawful subpoena, summons, warrant or court order which meets the requirements of § 226 (a)." [20] Laws 1976, ch. 252, § 1; Md. Ann. Code art. 11, § 225.

The trial judge, in directing the verdict in Waller's favor, employed a standard that was more favorable to the Bank than that we espouse. He told the jury as a matter of law the conduct of the Bank amounted "to a breach of contract." The judge grounded his instruction upon the Bank's duty "not to release confidential information *unless it was a matter of public necessity* or under ... court order...." (Emphasis supplied.) We believe the court to have been partially right, and partially wrong. Nevertheless, that portion that was incorrect afforded the Bank more protection than it was entitled to receive. This is so because, as we have seen, the only times that a bank may disclose a depositor's financial records are in response to a lawful court order, Md. Ann. Code art. 11, § 225, or upon authorization of the depositor. *Id.* When the court "cranked in" another reason for disclosure, it erred, but that error was to the advantage rather than detriment of the Bank.

---

**20.** Lest there be any doubt that it meant to tighten bank security so as to protect the people of this State from unauthorized disclosures of the financial records of individual customers by bank officers or employees, the General Assembly imposed stringent conditions as to the issuance of the court order and the procedure that must be followed after the order is obtained and before it is effective. Md. Ann. Code art. 11, § 226(a) provides:

"A fiduciary institution shall disclose financial records under § 225 of this article pursuant to a lawful subpoena, summons, warrant or court order only if the subpoena, summons, warrant or court order is served upon the customer and upon the fiduciary institution; however, the court for good cause may waive service of the subpoena, summons, warrant or court order upon the customer."

## II.

The Bank next asserts that the trial judge erred in failing to find as a matter of law that Brandt's actions were not the proximate cause of Waller's damages. His injuries, the Bank avers, were occasioned by the arrest following the police department's independent investigation. That investigation, the Bank says, was a superseding cause of the alleged harm to Waller.

Ordinarily, a question of proximate or "responsible," [21] as opposed to superseding causation is a matter to be resolved by the jury. *Dean v. Redmiles,* 280 Md. 137, 153, 374 A.2d 329, 338 (1977); *Short v. Wells,* 249 Md. 491, 240 A.2d 224 (1968); *Palms v. Shell Oil Co., supra.* It is where the evidence adduced and the inferences deducible therefrom admit of but one conclusion that the matter may be decided by the court as a matter of law. *Caroline v. Reicher,* 269 Md. 125, 304 A.2d 831 (1973); *Katz v. Holsinger,* 264 Md. 307, 286 A.2d 115 (1972); *Farley v. Yerman,* 231 Md. 444, 190 A.2d 773 (1963); *Kemp v. Armstrong,* 40 Md. App. 542, 392 A.2d 1161 (1978); *Iager v. Rogers,* 27 Md. App. 556, 341 A.2d 827, *cert. denied,* 276 Md. 745 (1975); *Palms v. Shell Oil, supra.*

The Court of Appeals has held that " 'negligence is not actionable unless it, without the intervention of any independent factor, causes the harm complained of. It involves of course the idea of continuity, that the negligent act continuously extends through every event, fact, act, and occurrence related to the tortious conduct of the defendant, and is itself the logical and natural cause of the injury complained of.' " *Owens v. Simon,* 245 Md. 404, 412, 226 A.2d 548, 552 (1966), *citing Holler v. Lowery,* 175 Md. 149, 161, 200 A. 353, 358 (1938).

An intervening causative factor, in order to be a superseding cause must "alone, without . . . [the defendant's] negligence contributing thereto in the slightest degree, . . . [produce] the injury." *Schiller v. Hecht Co.,* 165 Md. 415, 421, 169 A. 311, 313 (1933).

---

21. *See* Palms v. Shell Oil Co., 24 Md. App. 540, 543, 332 A.2d 300, 302 (1975).

The evidence adduced at trial of the instant case disclosed that the report by Brandt caused the police to focus their investigation upon Waller. Detective Ingel's testimony established that the information divulged by the Bank through Brandt was listed in the probable cause section of the application for an arrest warrant for Waller. Additionally, the photographs supplied by the Bank were those from which Brody, the residential robbery victim, made his initial identification of Waller as one of the culprits involved.

We think the evidence was such that reasoning minds could conclude only that the bank's action was the proximate cause of Waller's damages.

## III.

The appellant makes one final sortie against the judgment of the circuit court. The Bank asseverates that the evidence adduced at trial was insufficient to permit the issue of damage to Waller's reputation to go to the jury.

To obtain compensatory damages in this State, they must be proven with reasonable certainty and may not be based on speculation or conjecture. *Lazorcak v. Feuerstein,* 273 Md. 69, 327 A.2d 477 (1974); *Charles County Broadcasting Co. v. Meares,* 270 Md. 321, 311 A.2d 27 (1973); *Asibem Associates, Limited v. Rill,* 264 Md. 272, 286 A.2d 160 (1972).

The record in the case now before us discloses no evidence that Waller's reputation was damaged. He suggests that the damage is established by inference from the fact that his neighbors and family saw him being arrested. To draw that inference, we would have to engage in the very sort of speculation that is prohibited by the decisions of the Court of Appeals.

We think that the trial judge erred in submitting the issue to the jury, and we must, therefore, reverse the judgment, but only as to damages. All is not lost for Waller because he lives to fight another day. When the case is retried on the

question of damages, Waller is, of course, free to produce such witnesses as he may in order to support his claim.

> *Judgment as to liability affirmed,*
> *but reversed as to damages and*
> *remanded for further proceedings*
> *consistent with this opinion.*
> *Costs to be paid 2/3 by appellant and*
> *1/3 by appellee.*