941 A.2d 1222

Christopher Lewis **CARTER**

v.

**STATE of Maryland.**

**No. 2587, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Feb. 13, 2008.

George E. Burns, Jr. (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Steven L. Holcomb (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Argued before DAVIS, DEBORAH S. EYLER, JAMES A, KENNEY, III, (Retired, specially assigned), JJ.

KENNEY, J.

Appellant, Christopher Lewis Carter, was convicted by a jury sitting in the Circuit Court for Prince George's County (Shepherd, J., presiding) of possession with intent to distribute

cocaine, possession of cocaine, possession with intent to distribute marijuana, possession of marijuana, and possession of a firearm with a nexus to drug trafficking. He was sentenced to twenty years' imprisonment, with all but ten years suspended, for the possession with intent to distribute cocaine conviction; a five-year term for the possession with intent to distribute marijuana conviction; and five years' imprisonment, to be served without the possibility of parole, for the possession of a firearm conviction. All sentences were to run concurrently and the remaining convictions were merged for purposes of sentencing. Appellant noted a timely appeal and presents one question for our review:

Did the suppression court err in denying appellant's motion to suppress?

We conclude that there was no error and affirm the judgment of the suppression court.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

On May 11, 2005, at approximately 7:00 a.m., the Prince George's County Police Department executed a search and seizure warrant at 6271 Oxon Hill Road, Apartment 103, Oxon Hill, Maryland. Detective Jason Fisher testified that this was appellant's apartment and that appellant was found inside the residence. In the ensuing search of the apartment, from a safe in a bedroom, the police recovered 22.60 grams of crack cocaine, 609.9 grams of marijuana, $12,308 in cash, a portable digital scale, a Ruger 9mm pistol loaded with 15 hollow point bullets, and ammunition for a shotgun. Underneath the bed, the police located a Mossberg shotgun. The pistol and shotgun were later test fired and found to be operable. From atop a television in the bedroom, marijuana,

---

1. Appellant's sole challenge in this appeal is to the denial of his motion to suppress. Accordingly, we need only provide a brief summary of the evidence presented at trial. *See Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519 (2000) (in reviewing the denial of a motion to suppress, appellate court looks only to the record of the suppression hearing and not that of the trial).

weighing 1.47 grams, was recovered. Six open boxes of sandwich bags were found underneath the bed. From the bedroom closet, the police recovered another scale and a bag containing 12.85 grams of marijuana that was in a tennis shoe. In the top drawer of the bedroom dresser, the police found 10.43 grams of marijuana. Detective Fisher testified that the police concluded that the room was appellant's bedroom based on items found in the room that bore his name and appellant later informed the police that it was his bedroom.

Detective Melvin Powell, who testified "as an expert in the field of narcotics enforcement investigation, packaging, valuation and distribution[,]" opined that the cocaine and marijuana recovered from appellant's bedroom were possessed with the intent to distribute.

Appellant was informed of his rights and, after agreeing to make a statement outside the presence of an attorney, indicated that he had possessed the marijuana for personal use only. He also stated that he had cocaine for friends who liked to lace their joints. He added that he did not lace the joints for profit and instead did it strictly for his friends' pleasure. At trial, when asked if the crack cocaine was for his friends, appellant responded in the negative. Appellant explained: "[W]hat I meant was that when they came over, they brought their own. I smoked that. But I only smoked around my friends."

## DISCUSSION

Because appellant challenges the denial of his motion to suppress, we begin by recounting the evidence presented at the hearing on the motion. Detective Christopher Schultz testified that he applied for the search warrant for appellant's residence. The detective's investigation of appellant had its genesis in information received from an employee of M & T Bank. The information was not provided in response to a subpoena.

According to the application for search warrant:

During the month of April 2005, your affiant [Detective Schultz] and your co-affiant [Detective Fisher] received

information from Mrs. Thompson, the Regional Security Manager of M & T Bank. Mrs. Thompson stated that on numerous occasions, Christopher L. Carter has made several currency deposits into his private account with bills that are small in denomination and have a strong odor of Marijuana and an unknown chemical mixture. Mrs. Thompson recognized the odor of Marijuana on the currency because she was a one-time employee of the Anne Arundel County Police Department, and was trained in the recognition of Controlled Dangerous Substances. Mrs. Thompson further furnished your affiant with the mailing address for Christopher L. Carter as **6271 Oxon Hill Road # 301 Oxon Hill, Prince George's County, Maryland.**

Your affiant then checked the Department of Motor Vehicle's database and confirmed that a Christopher Lewis Carter with a date of birth of 08–28–1970 resides at **6271 Oxon Hill Road # 301 Oxon Hill, Prince George's County, Maryland.**

On April 21, 2005, your affiant noticed a trash dumpster in the parking lot, directly in front of the apartment located at **6271 Oxon Hill Road # 301 Oxon Hill, Prince George's County, Maryland.** Your affiant knows that it is common practice for residents of apartment complexes to place their trash in dumpsters for pick up by trash collectors. Your affiant was able to obtain one bag of trash from said dumpster. The trash bag was taken to a secure location and a search of the contents was conducted. The ensuing search revealed the following:

1. One (1) clear glassine baggie with trace amounts of suspected Cocaine base.

2. One (1) razor blade with trace amounts of suspected Cocaine base.

3. A quantity of suspected marijuana.

4. One (1) job application bearing the name Mark M. Harris and the address of **6271 Oxon Hill Road # 301 Oxon Hill, Prince George's County, Maryland.**

> 5. One (1) cigar magazine cover (back page) bearing the name Christopher Carter and the address of **6271 Oxon Hill Road Oxon Hill, Prince George's County, Maryland.**
>
> Your affiant and your co-affiant conducted a preliminary field test on the trace amounts of suspected Cocaine base utilizing the Duquenois–Levine Reagent System for Cocaine. The results of the preliminary examination revealed a positive reaction to the presence of Cocaine. Your affiant and your co-affiant also conducted a preliminary field-test on the suspected Marijuana utilizing the Duquenois–Levine Reagent System for Marijuana. The results of that examination indicated a positive reaction to the presence of THC, the active ingredient in Marijuana.
>
> Based on the items recovered from the dumpster, your affiant and your co-affiant know that controlled dangerous substances, especially Cocaine and Marijuana are being stored at the residence located at **6271 Oxon Hill Road # 301 Oxon Hill, Prince George's County, Maryland.** Your affiant and your co-affiant know through training and experience, that traffickers of controlled dangerous substances, including Marijuana and Cocaine, use their residences to store and process quantities of the drugs, prior to sale.

(Emphasis in original.)

Appellant testified that he had never given Mrs. Thompson or any other employee of M & T Bank permission to share his financial records or transactions with anyone else.

In denying appellant's motion to suppress, the suppression court stated:

> The defendant challenges the search warrant under the premise the information contained in the search warrant is illegal because under—pursuant to Financial Institutions Article Section 1–302 that disclosure of financial records is prohibited by a financial institution and the information that was provided that was formulated in part any way, the basis for the search warrant. Therefore—from the bank, there-

fore, should not be considered because it is—at least as the defendant argues—illegal. However, when you go and look at that section, Section 1-302, it says that a fiduciary institution, it's officers, employees, agents, or directors may not disclose . . . to any person any financial record relating to a consumer of the institution unless—and it goes through a lot of exceptions. One of which the defendant relies is that the customer gives authority to disclose that information.

Now, having looked at that section, and then going to the case of *Taylor v. NationsBank*, 365 Md. 166, [776 A.2d 645] (2001) case. It's a case in which—a civil case. However, in which some general information regarding one of the consumers was given. And what was given was his name and his unlisted telephone number and his account number. Because in the Taylor case there was some confusion as to which account the money was being deposited into. And so they were trying to get that cleared up. And so that was the information that was disclosed.

And in the *Taylor v. NationsBank* case, they talk about those records which were contemplated under Section 1-302 of the Financial Institutions Article and the case, the court clearly says that that general information does not violate that statute.

And I don't think that in looking at the search warrant, the four corners of the search warrant, that the information that was provided in any way comes close to providing financial records. The name and address was given and that's it. And also that the person recognizes that the money that had been deposited smelt of marijuana, but there was never any specifics about that person's—about the defendant in this case. About his financial records. I mean, the deposits were not given, amounts were not given. Just that when the money—cash was deposited, it smelled of marijuana, and gave his name and address. And from that the police officers further investigated and found traces of drugs in the defendant's trash.

And so I think, in looking at the four corners of the warrant, and in light of the law that the court has just recited, I think that it was probable cause to issue the search warrant. I don't see anything illegal about it. So your motion [ ]'s denied.

Appellant contends that, in his case, the bank became an agent of the State. He asserts that the General Assembly's purpose in enacting Maryland Code (2003), § 1–302 of the Financial Institutions Article ("FI") was, in part, to preserve and protect the confidential relationship between fiduciary institutions and their customers. He claims that this purpose should be interpreted broadly and thus asserts that *Taylor v. NationsBank, N.A.,* 365 Md. 166, 776 A.2d 645 (2001), should not be applied to permit bank employees to volunteer information to government authorities. According to appellant, bank customers should not have to fear that depositing money in small denominations will be reported to the police because of a bank employee's olfactory acquired beliefs. He contends that the investigation in his case proceeded because of the improper disclosure of confidential information, and therefore the warrant was illegally obtained and the fruits of the resulting search should have been suppressed.

"Our review of the judge's decision to issue the search warrant[ ] is limited to whether there was a substantial basis for concluding that the evidence sought would be discovered in the place described in the application for the warrant." *Birchead v. State,* 317 Md. 691, 701, 566 A.2d 488 (1989) (citation omitted). "The substantial basis standard involves 'something less than finding the existence of probable cause,' and 'is less demanding than even the familiar "clearly erroneous" standard by which appellate courts review judicial fact finding in a trial setting.'" *State v. Coley,* 145 Md.App. 502, 521, 805 A.2d 1186 (2002) (quoting *State v. Amerman,* 84 Md.App. 461, 470–71, 472, 581 A.2d 19 (1990)) (internal citation omitted). Furthermore, "[t]he judge's determination that probable cause exists is entitled to great deference." *McDonald v. State,* 347 Md. 452, 467, 701 A.2d 675 (1997)

(citations omitted). The issuing judge's probable cause determination is a practical, common-sense decision based on analyzing the affidavit in light of the totality of the circumstances. *State v. Lee*, 330 Md. 320, 326, 624 A.2d 492 (1993); *Potts v. State*, 300 Md. 567, 576, 479 A.2d 1335 (1984). "[An] after-the-fact scrutiny by an appellate court regarding the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). Doubtful or marginal cases should be resolved in favor of the judge's decision to issue the warrant. *State v. Amerman*, 84 Md.App. 461, 470, 581 A.2d 19 (1990).

Appellant does not allege that the information contained in the affidavit, if the information was obtained legally, did not give rise to probable cause. Rather, he claims that the information provided by Mrs. Thompson was illegally obtained and could not be used to support issuance of the search warrant. We are thus called upon to determine whether the suppression court erred in failing to find that there was a violation of FI § 1–302, which provides:

Except as otherwise expressly provided in this subtitle, a fiduciary institution, its officers, employees, agents, and directors:

(1) May not disclose to any person any financial record relating to a customer of the institution unless:

(i) The customer has authorized the disclosure to that person;

(ii) Proceedings have been instituted for appointment of a guardian of the property or of the person of the customer, and court-appointed counsel presents to the fiduciary institution an order of appointment or a certified copy of the order issued by or under the direction or supervision of the court or an officer of the court;

(iii) The customer is disabled and a guardian is appointed or qualified by a court, and the guardian presents to the

fiduciary institution an order of appointment or a certified copy of the order issued by or under the direction or supervision of the court or an officer of the court;

(iv) The customer is deceased and a personal representative is appointed or qualified by a court, and the personal representative presents to the fiduciary institution letters of administration issued by or under the direction or supervision of the court or an officer of the court;

(v) The Department of Human Resources requests the financial record in the course of verifying the individual's eligibility for public assistance;

(vi) The institution received a request, notice, or subpoena for information directly from the Child Support Enforcement Administration of the Department of Human Resources under § 10–108.2, § 10–108.3, or § 10–108.5 of the Family Law Article or indirectly through the Federal Parent Locator Service under 42 U.S.C. § 666(a)(17); or

(vii) The institution received a request, notice, or subpoena for information directly from the Comptroller under § 13–804 or § 13–812 of the Tax–General Article;

(2) Shall disclose any information requested in writing by the Department of Human Resources relative to moneys held in a savings deposit, time deposit, demand deposit, or any other deposit held by the fiduciary institution in the name of the individual who is a recipient or applicant for public assistance; and

(3) Shall disclose any information requested in writing by the Comptroller relative to moneys held in a savings deposit, time deposit, demand deposit, or any other deposit held by the fiduciary institution in the name of an individual whose property is subject to a tax lien.

"Financial record" is defined in FI § 1–301(c), which states:

(1) "Financial record" means the original or any copy or record of:

(i) A document that grants signature authority over a deposit or share account;

(ii) A statement, ledger card, or other record of a deposit or share account that shows transactions in or with respect to that deposit or account;

(iii) A check, clear draft, or money order that is drawn on a fiduciary institution or issued and payable by or through a fiduciary institution;

(iv) Any item, other than an institutional or periodic charge, that is made under an agreement between a fiduciary institution and another person and that constitutes a debit or a credit to that person's deposit or share account; or

(v) Any information that relates to a loan account or an application for a loan.

(2) "Financial record" includes any evidence of a transaction conducted by means of an electronic terminal.

In support of his position that the evidence should have been suppressed because the information provided by Mrs. Thompson was obtained illegally, appellant refers us to *Miles v. State*, 365 Md. 488, 781 A.2d 787 (2001), without explanation. At issue in *Miles* was the violation of the Maryland Wiretapping Statute, Maryland Code (2006), § 10–401 et seq. of the Courts and Judicial Proceedings Article ("CJ"). In that case, a private citizen's police scanner picked up an incriminating cell phone conversation between Jody and Jona Miles, who were husband and wife. The Miles' cell phone conversation related to a recent murder so the citizen taped the conversation and gave it to the police. Officers listened to the tape and, based on prior contacts with the couple, were able to identify their voices. The police then obtained two search warrants for the wife's residence and that of her parents. The wife was subsequently arrested, gave a statement to the police, and assisted them in locating her husband.

Concluding that use of the taped cell phone conversation violated the Wiretapping Statute, the trial court suppressed the taped cell phone conversation as well as evidence seized pursuant to the search warrants in which the affidavit of probable cause made explicit reference to the facts contained

in the taped cell phone conversation.  The trial court declined to suppress other evidence, such as statements made by the husband and wife and evidence obtained pursuant to a consent search.  The husband was subsequently convicted of felony homicide and related offenses.  He was sentenced to death.

■ On appeal, the Court of Appeals concluded that the trial court properly suppressed the taped cell phone conversation and any reference to it during trial as well as the evidence seized pursuant to the search warrants that disclosed the taped conversation in the affidavit of probable cause.  *Miles,* 365 Md. at 514–15, 781 A.2d 787.  The Court of Appeals also held that, based on the attenuation doctrine, the trial court properly declined to suppress the remaining evidence.[2]  *Id.* at 506, 781 A.2d 787.

Although not entirely clear, appellant appears to rely on *Miles* for the proposition that a violation of FI § 1–302 would require suppression of the evidence just as a violation of the Wiretapping Statute requires suppression.  Appellant does not address, however, the lack of an exclusionary provision in FI § 1–302.  In *Miles,* the Court of Appeals explained: "Although the Maryland Wiretapping Statute is grounded, to some extent, in Fourth Amendment jurisprudence, it contains its own exclusionary provision in Section 10–405 [3] to deter law

---

2.  In appellant's case, the State addresses the attenuation doctrine, but it is not properly before us as it was not raised at the suppression hearing and its application was never decided by the suppression court.  *See Conyers v. State,* 367 Md. 571, 593, 790 A.2d 15 (2002) ("an argument not raised in the proceedings below is not preserved for appellate review") (citation omitted); *Russell v. State,* 138 Md.App. 638, 646, 773 A.2d 564 (2001) (argument not presented to suppression court is not preserved).

3.  CJ § 10–405(a) provides, in part:
    [W]henever any wire or oral communication has been intercepted, no part of the contents of the communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of this State, or a political subdivision thereof if the disclosure of that information would be in violation of this subtitle.

enforcement officials from unlawful or unauthorized interception of wire and oral communications." *Miles*, 365 Md. at 509, 781 A.2d 787. There is no such provision in FI § 1–302.[4]

Furthermore, *Taylor v. NationsBank, N.A.*, 365 Md. 166, 776 A.2d 645 (2001), does not support appellant's position. In that case, Walter Scott and Garfield Taylor, who were both employed by the Federal Mortgage Association (hereinafter "Fannie Mae"), had their paychecks deposited directly into their checking accounts, which they both had with Nations-Bank. When Scott learned that his pay had not been deposited into his account, he called NationsBank and spoke with a customer service representative. That person informed Scott that his check had been deposited into the account shown on his Fannie Mae pay stub,[5] which was not Scott's account. The customer service representative also informed Scott that the account into which the funds had been deposited belonged to Garfield Taylor. Scott had called NationsBank on a Saturday and following a discussion about how to protect Scott's money since the earliest NationsBank could correct the error was on Monday, the customer service representative gave Taylor's unlisted home telephone number to Scott and suggested that Scott call Taylor to explain the situation. Scott called Taylor and informed Taylor of what had happened.

Taylor filed suit against NationsBank in the Circuit Court for Baltimore City. He alleged breach of contract, breach of privacy, and breach of legally guaranteed confidentiality. The

---

**4.** Penalties for unauthorized disclosure of financial records are provided for in FI § 1–305, which states:

(a) *Officers, employees, agents and directors of institution.*—Any officer, employee, agent, or director of a fiduciary institution who knowingly and willfully discloses financial records in violation of this subtitle is guilty of a misdemeanor and on conviction is subject to a fine of not more than $1,000.

(b) *Others.*—Any person who knowingly and willfully induces or attempts to induce an officer, employee, agent, or director of a fiduciary institution to disclose financial records in violation of this subtitle is guilty of a misdemeanor and on conviction is subject to a fine of not more than $1,000.

**5.** The checking account number was printed on the pay stub.

circuit court granted NationsBank's motion for summary judgment and this Court affirmed.[6]

Before the Court of Appeals, Taylor alleged, *inter alia*, that NationsBank had violated FI § 1–302 by disclosing to Scott that his paycheck had been deposited into Taylor's checking account and then informing Scott of Taylor's name, telephone number, and account number. *Taylor*, 365 Md. at 180, 776 A.2d 645. Because NationsBank had informed Scott that his paycheck had been deposited in Taylor's account, Taylor also alleged that NationsBank had released account activity. *Id.* at 180–81, 776 A.2d 645. He asserted that the account activity was "clearly account information under any possible reasonable definition of the term, and is certainly within the scope of § 1–301 et seq. of the Financial Institutions Code ...." *Taylor*, 365 Md. at 181, 776 A.2d 645.

In examining FI § 1–301(c), the Court of Appeals noted that,

> [b]y its plain terms, what is contemplated to be prohibited, with the possible exception of item (v), pertaining to loan accounts and applications for loans, is the disclosure of certain records, rather than information about those records. Section 1–301(c) is specific in its reference to "the original or any copy or record of" certain documents, subsection (1)(i), certain statements, ledger cards or "other records," subsection (1)(ii), certain checks, clear drafts or money orders, subsection (1)(iii), certain items, subsection (1)(iv), and certain information. Subsection (1)(v).

*Taylor*, 365 Md. at 183, 776 A.2d 645.

In holding that FI § 1–302 had not been violated, the Court of Appeals wrote:

> There is in this case no contention that any records were given to Mr. Scott-no originals or copies of any documents, statements, ledger cards, checks, clear drafts, money orders, items of any kind, or information is alleged. Rather,

---

**6.** We did not address whether the disclosures violated FI § 1–301 through 1–305. *Taylor*, 365 Md. at 171 n. 3, 776 A.2d 645.

the only allegations, and the undisputed facts, are that the respondent orally disclosed information that undoubtedly is account information. That does not, however, render the information financial records and, therefore, violative of the statute. We hold that the statute was not violated.

*Taylor,* 365 Md. at 183, 776 A.2d 645.

Taylor referred the Court of Appeals to *Suburban Trust Co. v. Waller,* 44 Md.App. 335, 408 A.2d 758 (1979), in support of his position.[7] There, after Waller cashed his income tax refund check at the U.S. Treasury, he deposited $800 in cash into his account with Suburban Trust Company. The money was in fifty and one hundred dollar denominations and had sequential serial numbers. Suburban Trust eventually contacted the Montgomery County Police Department and, based on the information provided by a bank employee, Waller was arrested for robbery. Ultimately, the charges against Waller were dropped. Waller then filed suit against Suburban Trust for invasion of privacy and breach of an implied condition of their contract, that is, the obligation of confidentiality. This Court affirmed, in part, the trial court's directed verdict in favor of Waller on the breach of contract claim. *Waller,* 44 Md.App. at 346, 408 A.2d 758.

The Court of Appeals noted that in *Waller* this Court used "expansive language when speaking of the purpose of the statute[,]" a predecessor of FI § 1–302. *Taylor,* 365 Md. at 184, 776 A.2d 645. As an example of that broad language, the Court of Appeals quoted from *Waller:*

"By the enactment of Laws 1976, ch. 252, the people of Maryland, through their duly elected representatives, made explicit what had theretofore been implicit banks may not, absent legal compulsion or express or implied authorization from the depositor concerned, reveal any information to any one, including police and other government agencies, about the depositor's dealings with the bank."

---

7. Appellant also refers us to *Waller* in support of his position that FI § 1–302 should be interpreted broadly in order to carry out the purpose of the statute.

*Taylor*, 365 Md. at 184, 776 A.2d 645 (quoting *Waller*, 44 Md.App. at 345, 408 A.2d 758). "[N]ot persuaded[ ]" by this language, the Court concluded that *Waller* did not support Taylor's position, 365 Md. at 184, 776 A.2d 645, and further quoted from *Waller* concerning the legislative action:

"Apparently disturbed by what it believed to be the trend, out of all scotch and notch,[17] among banks and other fiduciary institutions to furnish information without compulsion to governmental agencies, the Legislature in its preamble to Laws 1976, ch. 252 said:

'(a) The General Assembly of Maryland finds and declares that:

'(1) procedures and policies governing the relationship between fiduciary institutions and government agencies have in some cases developed without due regard to the constitutional rights of customers of those institutions; and

'(2) the confidential relationships between fiduciary institutions and their customers must be preserved and protected.'

'(b) It is the purpose of this Act to protect and preserve the confidential relationship between fiduciary institutions and their customers and to promote commerce by prescribing policies and procedures applicable to the disclosure of customer records by fiduciary institutions.' "

[17] The expression comes from the child's game of hopscotch. It means "beyond all bounds" and refers to the boundary lines (scotches) and corners (notches) used in the game. Morris, Dictionary of Word and Phrase Origins 425 (1977).

*Taylor*, 365 Md. at 184–85, 776 A.2d 645 (quoting *Waller*, 44 Md.App. at 344–45, 408 A.2d 758). Nonetheless, the Court of Appeals explained that in *Waller* this Court "acknowledge[d] the statute's inapplicability" and "stated that the action of the General Assembly in enacting it buttressed the conclusion [the Court of Special Appeals] reached in that case." *Taylor*, 365 Md. at 183–84, 776 A.2d 645.

In *Taylor*, the Court of Appeals concluded that "the concern that the statute addressed was one which lends credence to the interpretation of the statute that we reach." *Taylor*, 365

Md. at 185, 776 A.2d 645. Further, the Court of Appeals agreed with NationsBank "that *'Waller* does not stand for the general proposition that § 1–301 et seq. provides blanket protection for depositors "from disclosure of information by a bank." ' " *Taylor,* 365 Md. at 185, 776 A.2d 645.

In appellant's case, M & T Bank disclosed to the police that, on several occasions, appellant had deposited into his account bills that were of small denominations and that bore an odor of marijuana and an unknown chemical mixture. The bank also provided appellant's address to the police. As explained in *Taylor,* although M & T Bank gave the police certain information about appellant's account, it did not disclose any of appellant's financial records within the meaning of FI §§ 1–301 & 1–302. We thus conclude that the suppression court committed no error in finding that the information provided by M & T Bank could be properly relied upon in establishing probable cause to issue the warrant. In addition, after receiving the information from M & T Bank, the detectives confirmed appellant's address and upon further investigation, found trace amounts of marijuana and cocaine in trash that was linked to appellant's residence. As a result, there was a substantial basis for concluding that evidence of drug trafficking would be found in appellant's residence and the warrant was properly issued.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**